SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-09-0095-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR1992-005731 |
| SCOTT ALAN LEHR, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Andrew G. Klein, Judge

**AFFIRMED**
_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                    Phoenix
      By    Kent E. Cattani, Chief Counsel,
            Criminal Appeals/Capital Litigation Section
            Jeffrey A. Zick, Assistant Attorney General
Attorneys for State of Arizona

DAVID GOLDBERG ATTORNEY AT LAW                    Fort Collins, CO
      By    David Goldberg
Attorney for Scott Alan Lehr
_____

**B A L E S**, Justice

¶1     This automatic appeal arises from Scott Alan Lehr's convictions and death sentences for murdering two women. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031 (2011).

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2     Over the course of about a year, beginning in February

1991, Lehr separately attacked ten women in central and northwest Phoenix, abducting and sexually assaulting his victims and brutally murdering three of them. He was convicted of three counts of first degree murder, three counts of attempted first degree murder, two counts of aggravated assault, seven counts of kidnapping, and twenty-two counts involving sexual assault. *See State v. Lehr* ("*Lehr I*"), 201 Ariz. 509, 512 ¶ 1, 38 P.3d 1172, 1175 (2002). The trial court imposed death sentences for Lehr's murder convictions for victims M.M., M.C., and B.C.

¶3        This Court affirmed Lehr's convictions and sentences for the counts related to seven victims, but reversed his convictions concerning M.M., M.C., and W.C. because the trial court had improperly restricted Lehr's cross-examination of the State's DNA expert. *Id.* at 518-20 ¶¶ 32-43, 38 P.3d at 1181-83. On independent review, this Court affirmed Lehr's death sentence for B.C.'s murder. *Id.* at 522-24 ¶¶ 60-66, 38 P.3d at 1185-86.

¶4        The case was remanded for a retrial on the charges concerning M.M., M.C., and W.C. *See id.* at 524 ¶ 67, 38 P.3d at 1186. Before the mandate issued, however, the Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002). In light of *Ring*, this Court also vacated Lehr's death sentence for B.C.'s murder and remanded the case for resentencing. *State v. Lehr* ("*Lehr II*"), 205 Ariz. 107, 110 ¶ 10, 67 P.3d 703, 706 (2003).

¶5        The counts involving victims M.M., M.C., and W.C. were

retried in 2009.  After finding Lehr guilty on these counts, the jury concluded that Lehr should be sentenced to death for the murders of M.M. and M.C., but it could not reach a verdict on the appropriate sentence for the murder of B.C.  In lieu of retrying the sentencing phase for B.C.'s murder, the State withdrew its request for the death penalty, and the trial court sentenced Lehr to life imprisonment to be served consecutively to his other sentences.  The trial court also sentenced Lehr to seven-year consecutive terms of imprisonment for each non-capital offense.  This appeal followed.

## DISCUSSION

¶6       Lehr raises eight issues on appeal and also urges the Court, in its independent review, to vacate his death sentences and impose terms of life imprisonment without parole.

### A.    Waiver of Right to Attend Trial

¶7       Lehr repeatedly told the trial court that he wanted to waive his right to attend pretrial and trial proceedings.  He now contends that his waiver was involuntary and violated the Fifth, Sixth, and Fourteenth Amendments because it was based on the trial court's adherence to a jail policy requiring him to wear a stun belt in the courtroom.  Not having made this objection below, Lehr argues that the alleged error was both fundamental and structural.

¶8       We review de novo whether a defendant knowingly and

3

voluntarily waived his right to be present at trial. *See Campbell v. Wood*, 18 F.3d 662, 672 (9th Cir. 1994) (noting that voluntariness is ultimately a legal question). When a defendant does not object to a trial court's requiring him to wear restraints such as stun belts, we review for fundamental error. *State v. Dixon*, 226 Ariz. 545, ¶ 24, 250 P.3d 1174, 1180 (2011).

¶9 Lehr has not established error, fundamental or otherwise. Although he contends that he waived his right to be present only because he did not want to wear a stun belt, the record belies this assertion. Before trial, Lehr informed the court several times that he desired to be absent from all court proceedings. The trial court held lengthy discussions to confirm that Lehr understood his right to be present and that he knowingly, intelligently, and voluntarily waived this right. The issue arose again during the trial, when Lehr agreed to stipulate that W.C. had previously identified him in a photo lineup. In discussing the stipulation, Lehr reaffirmed his intent to absent himself during the entire trial, and the trial court found his waiver knowing, intelligent, and voluntary.

¶10 On the eve of the penalty phase, the trial court again discussed with Lehr his waiver of his right to be present. Lehr said that he wanted to absent himself in order to increase his chances of receiving the death penalty. When the trial court told Lehr that he would need to be present for the reading of

4

the verdicts, Lehr for the first time voiced concerns about wearing a stun belt – which he characterized as "that deadly execution device" – and asked if he could instead appear dressed in jail clothes and wearing chains.

¶11    Lehr contends that his waiver was invalid because the trial court, before the eve of the penalty phase, did not ask why he did not want to be present.  Lehr cites *United States v. Mitchell*, 502 F.3d 931, 986-87 (9th Cir. 2007), for the proposition that a judge must inquire into a defendant's reasons for absenting himself from trial.  *Mitchell* does not so hold. Although the trial court in *Mitchell* did ask the defendant why he wished to absent himself, the Ninth Circuit's opinion does not address whether such an inquiry is required, but instead holds that a capital defendant may absent himself from the penalty phase and the trial court need not hold a competency hearing when the defendant elects to do so.  *Id.* at 986-88.

¶12    Similarly unavailing is Lehr's supplemental citation to *In re MH 2006-000749*, 214 Ariz. 318, 324-25 ¶ 29, 152 P.3d 1201, 1207-08 (App. 2007).  In that case, the court of appeals observed that "[t]he better practice in cases in which a court is called upon to assess whether a right has been voluntarily waived is to make specific findings."  *Id.*  Although judges may sometimes appropriately inquire into a party's reasons for waiving a right, they are not constitutionally required to do so

for a waiver to be valid. *Cf. State v. Hunnel*, 873 P.2d 877, 880 (Idaho 1994) (holding that a trial court need not inquire into the reasons for a defendant's waiver of right to counsel so "long as the record as a whole and inferences drawn therefrom show the waiver is voluntary and knowing").

¶13 We also reject Lehr's belated assertion that he waived his presence solely because he did not want to wear a stun belt. The only time he expressed concern about a stun belt was when the trial court told him he would be required to appear in the courtroom for the return of the sentencing verdicts. But even if his desire not to wear a stun belt influenced his waiver, Lehr has not established any error by the trial court.

¶14 Lehr's argument presumes that if he had not waived his presence, the trial court would have required him to wear a stun belt merely because of jail policy. We reject this presumption. In fact, on the eve of opening statements for the guilt phase, the trial court told counsel that if Lehr chose to appear in court and objected to a stun belt, the court would require the jail security officers to explain their policies and "why they apply to [Lehr] in this case" and the court would then make a ruling. When Lehr later appeared in court for the reading of the sentencing verdicts, the trial court, consistent with *Deck v. Missouri*, 544 U.S. 622 (2005), and *State v. Gomez*, 211 Ariz. 494, 503 ¶ 43, 123 P.3d 1131, 1140 (2005), made a case-specific

6

determination that security concerns warranted shackling Lehr.

¶15    Because the trial court here appropriately conducted several hearings to verify Lehr's continued desire to absent himself from trial and correctly found that Lehr's decision was knowing, intelligent, and voluntary, Lehr has not established error.

**B.    Joinder and Other Acts Evidence**

¶16    Lehr makes several arguments regarding the joinder of charges for trial and the use of other acts evidence.

**1.    Admission of Other Acts Evidence**

¶17    Pursuant to Rules 404(b) and (c) of the Arizona Rules of Evidence, the trial court allowed the State to present evidence of conduct involved in convictions upheld in *Lehr I* to show modus operandi, identity, and aberrant sexual propensity.

¶18    Rule 404(b) allows the admission of evidence of "other crimes, wrongs, or acts" for purposes that include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."    In cases involving sexual offense charges, Rule 404(c) allows courts to admit evidence of "other crimes, wrongs, or acts . . . if relevant to show that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the offense charged."    To admit such evidence, a trial court must specifically find, among other things, that the other acts

7

provide "a reasonable basis to infer that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the crime charged" and that "[t]he evidentiary value of proof of the other act is not substantially outweighed by danger of unfair prejudice, confusion of issues, or other factors mentioned in Rule 403." Ariz. R. Evid. 404(c)(1).

¶19      Lehr argues that the acts involved in his other crimes were not sufficiently similar to warrant admitting evidence of them under Rule 404(b). He also argues that such evidence was inadmissible under Rule 404(c) because its probative value was substantially outweighed by its prejudicial effect. We review the trial court's admission of this evidence for an abuse of discretion. *See State v. Villalobos*, 225 Ariz. 74, 79–80 ¶ 18, 235 P.3d 227, 232–33 (2010).

¶20      Before admitting the other acts evidence, the trial court held an evidentiary hearing at which the State presented expert testimony. The court found "that the information presented . . . convincingly establish[ed] that evidence of other acts provides a reasonable basis to infer that [Lehr] has a character trait which gives rise to an aberrant sexual propensity for violent and sexual acts against non-consenting females." Consistent with Rule 404(c)(1), the trial court also found that "the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

The trial court further found that the evidence of previous crimes could be admitted to show "modus operandi and identity" because the "attacks were strikingly similar in the way the Defendant lured the victims and transported them to the area where they were assaulted, how he assaulted them, where he assaulted them, and how he left them."

¶21    In arguing that the trial court erred in admitting the other acts evidence, Lehr notes that the attacks occurred at different times and on different days of the week, the victims varied in age, and other differences.  The trial court, however, identified extensive similarities among Lehr's crimes.  Acts need not be perfectly similar in order for evidence of them to be admitted under Rule 404.  *State v. Roscoe*, 145 Ariz. 212, 216, 700 P.2d 1312, 1317 (1984).  The trial court did not abuse its discretion by admitting the other acts evidence.

### 2.    Joinder of Charges for Trial

¶22    The court denied Lehr's motion to sever the trials on the charges relating to victims M.M., M.C., and W.C. and to separately resentence Lehr for the murder of B.C.  "A denial of a motion to sever under Rule 13.4(b) is reversible error only if the evidence of other crimes would not have been admitted at trial for an evidentiary purpose anyway." *State v. Aguilar*, 209 Ariz. 40, 51 ¶ 38, 97 P.3d 865, 876 (2004) (quotation marks and citations omitted).  The trial court denied Lehr's motion to

sever the retrials and the resentencing because "evidence of the other offense or offenses would be admissible under applicable rules of evidence if the offenses were tried separately." Ariz. R. Crim. P. 13.4(b). The court properly applied Rule 13.4(b) in denying Lehr's motion to sever.

### 3. Jury Instructions and State's Closing

¶23 Lehr also argues that the trial court erred in instructing the jury that it could consider the evidence of other acts for all of the purposes listed in Rule 404(b). Repeatedly during trial and at the close of the guilt phase, the trial court gave limiting instructions to the jury about using evidence for 404(b) and (c) purposes. The court instructed the jury that it could consider the other acts evidence under Rule 404(b) only "to establish the Defendant's motive, opportunity, intent, preparation, plan, knowledge, and identity." On the third day of trial, Lehr asked the court to remove from the jury instructions all reasons to consider Rule 404(b) evidence except identity. The court denied Lehr's request.

¶24 Although trial courts should specify in their limiting instruction the purposes for which Rule 404(b) evidence is being admitted, the failure to do so here was harmless error. *See United States v. Wilson*, 107 F.3d 774, 783 (10th Cir. 1997) (holding that trial court's failure to instruct jury on specific purpose for admitting Rule 404(b) evidence "is harmless if its

10

purpose is apparent from the record and it was properly admitted"). Here, the purposes for which the evidence was admitted were apparent from the record. In closing arguments, the State urged the jury to consider the evidence only for the original purposes for which it had been offered: to show modus operandi, identity, and an aberrant sexual propensity.

¶25 Relying on *State v. Blakely*, 204 Ariz. 429, 65 P.3d 77 (2003), Lehr next contends that the State's discussion of Rule 404(b) factors in its closing remarks changed the theory of prosecution and violated due process because he did not have a chance to respond to the expanded use of the other acts evidence. *Blakely*, however, is inapposite. In that case, at the close of the evidence, the State changed the predicate felony used to charge the defendant with felony murder. *Id.* at 438-39 ¶¶ 42, 46, 65 P.3d at 86–87. We held that Blakely was deprived of his right to a fair trial because "nothing in the proceedings up to the eve of *closing arguments* gave him notice" that the state was going to allege the predicate felony it asserted at the close of evidence. *Id.* at 440 ¶¶ 53-54, 65 P.3d at 88. Lehr, in contrast, was on notice well before the start of trial that the State planned to use other acts evidence. Additionally, as discussed above, the State urged the jury in closing arguments to consider the evidence only for the original purposes for which it had been offered.

11

### 4. Admission of Evidence of B.C.'s Murder

¶26    Lehr finally contends that admission of evidence of B.C.'s murder was improper and exposed him to double jeopardy because this Court held in *Lehr I* that there was insufficient evidence to prove the aggravator under A.R.S. § 13-751(F)(6). The fact that the State produced insufficient evidence at Lehr's original trial to establish the (F)(6) aggravator, however, does not imply that evidence of the murder could not satisfy the requirements for admissibility under Rules 404(b) and (c) at his 2009 trial. Double jeopardy concerns are also not implicated. This Court's 2002 ruling that there was insufficient evidence to prove the (F)(6) aggravator was not an acquittal, *see Poland v. Arizona*, 476 U.S. 147, 155–56 (1986), and, in any event, admission of evidence of other acts for which a defendant has been acquitted does not violate double jeopardy. *See Dowling v. United* States, 493 U.S. 342, 348 (1990).

### C.    Right of Confrontation

¶27    Before the 2009 retrial, the State sought to have victim T.H. declared unavailable under Arizona Rule of Criminal Procedure 19.3(c) because she refused to testify against Lehr. At the 1996 trial, T.H. testified that Lehr had abducted and raped her and then threw rocks at her as she fled. The State sought to introduce evidence of these other acts in the retrial.

¶28    At a hearing to determine her availability as a

witness, T.H. testified that she would not testify against Lehr because she strongly opposed capital punishment and had testified previously only because the prosecutor assured her that her testimony would not be used to decide whether to impose the death penalty. The trial court told T.H. that if she refused to testify the court could find her in criminal contempt, jail her for up to six months, fine her up to $300, and force her to wake up early every morning in jail and return to court to revisit whether she would testify. T.H. said she accepted the possible consequences and reaffirmed her refusal to testify.

¶29      The trial court found T.H. unavailable under Arizona Rule of Evidence 804(a)(2). Noting that the State had "done everything in its power to compel [T.H.'s] testimony," the court concluded that "putting her in jail or fining her is not going to change her mind" and that T.H. would persist in refusing to testify. Because her previous testimony was "given under oath and subject to cross-examination," the court allowed the State to read her previous testimony into the record.

¶30      Lehr argues that the trial court abused its discretion in admitting this evidence and violated his Sixth Amendment right of confrontation. We review a trial court's finding of a witness's unavailability for an abuse of discretion. *State v. Montaño*, 204 Ariz. 413, 420 ¶ 25, 65 P.3d 61, 68 (2003).

13

¶31     Rule 19.3(c)(1) of the Arizona Rules of Criminal Procedure allows "[s]tatements made under oath by a party or witness during a previous judicial proceeding" to be admitted if

> (i) The party against whom the former testimony is offered was a party to the action or proceeding during which a statement was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party now has . . . and

> (ii) The declarant is unavailable as a witness, or is present and subject to cross-examination.

¶32     The definition of "unavailability" under the Arizona Rules of Evidence includes situations in which the declarant "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so."  Ariz. R. Evid. 804(a)(2).

¶33     The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause allows the admission of testimonial hearsay that satisfies the common law requirements of "unavailability and a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 68 (2004).  Lehr had an opportunity to cross examine T.H. at his first trial.  The only Confrontation Clause issue, therefore, is whether T.H. was unavailable to testify.

¶34     A witness's "refusal to testify . . . [makes] him

14

'unavailable' for Confrontation Clause purposes." *Jennings v. Maynard*, 946 F.2d 1502, 1505 (10th Cir. 1991); *see also United States v. Bourjaily*, 781 F.2d 539, 543-44 (6th Cir. 1986) (holding that a witness was "unavailable because he refused to testify"); *cf. United States v. Tirado-Tirado*, 563 F.3d 117, 123 n.3 (5th Cir. 2009) ("*Crawford* did not change the definition of 'unavailability' for Confrontation Clause purposes; pre-*Crawford* cases on this point remain good law.").

¶35    In admitting the prior testimony by T.H., the trial court did not abuse its discretion or violate Lehr's rights under the Confrontation Clause.

### D.    DNA Testing That Consumed the Remaining Sample

¶36    Lehr argues that he was denied his right to due process because the State, without consulting Lehr's attorneys, authorized DNA testing that consumed the swab sticks from which DNA was extracted.   The trial court admitted the DNA test results over Lehr's objection.   "We review evidentiary rulings for an abuse of discretion." *State v. Andriano*, 215 Ariz. 497, 502 ¶ 17, 161 P.3d 540, 545 (2007).

¶37    In 1992, the State performed inconclusive DNA tests on anal and vaginal swabs from M.M.'s body.   This testing consumed the cotton on the swabs but not the sticks, which were retained. In 2002, the State asked the Phoenix Police Department Crime Laboratory to perform DNA tests on the remaining sticks with

15

techniques not available in 1992. Without notifying the defense, the prosecutor authorized the lab to complete the tests even though doing so would consume the sticks. DNA extracted from the anal swab matched Lehr's DNA. Although the test consumed the sticks, DNA extractions obtained from the sticks were preserved and were available to Lehr for testing. Lehr did not elect to test the extractions.

¶38 Before trial, Lehr moved to preclude the DNA evidence from the 2002 tests. After a hearing, the trial court found no evidence of bad faith on the State's part and no evidence that retesting would have exonerated Lehr or had a tendency to exonerate him. The court denied Lehr's motion, but permitted him to "attack the manner in which the test was conducted and argue to the jury that consumption of the initial sample deprived [Lehr] of the ability to test the original sample." The court also noted that Lehr was "welcome to retest the extraction." In denying Lehr's motion for reconsideration, the court noted that he had "not challenged the test performed, sought expert testimony concerning the extraction procedure or test results, nor requested to have the extraction re-tested." The court found that "no showing can be made that any re-testing was likely to exonerate the Defendant or produce different results" and therefore Lehr was not prejudiced.

¶39 The Due Process Clause of the Fourteenth Amendment

16

requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense." C*alifornia v. Trombetta*, 467 U.S. 479, 485 (1984). "To safeguard that right, the [Supreme] Court has developed what might loosely be called the area of constitutionally guaranteed access to evidence." *Id*. (internal quotation marks and citation omitted).

¶**40**     In determining whether the state's failure to preserve evidence violates a defendant's constitutional rights, "[t]he critical distinction . . . is between material exculpatory evidence and potentially useful evidence." *State v. Speer*, 221 Ariz. 449, 457 ¶ 37, 212 P.3d 787, 795 (2009) (internal quotation marks and citations omitted). Prosecutors have a duty to disclose evidence that "is clearly supportive of a claim of innocence." *United States v. Agurs*, 427 U.S. 97, 107 (1976). The state denies a defendant due process when it destroys evidence that "both possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488-89.

¶**41**     When evidence is merely potentially exculpatory, however, the "failure to preserve potentially useful evidence does not constitute a denial of due process of law" unless the defendant "can show bad faith on the part of the police."

17

*Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  Absent bad faith, "[t]he inference that the evidence may be exculpatory is not strong enough to dismiss the case.  It is enough to let the jury decide whether to draw such an inference."  *State v. Youngblood*, 173 Ariz. 502, 507, 844 P.2d 1152, 1157 (1993).

¶42     The trial court did not abuse its discretion in denying Lehr's motion to preclude the DNA evidence.  Because there is no evidence that the swab sticks were exculpatory (indeed, they proved to be inculpatory, because the DNA extracted from them matched Lehr's), the key question is whether the State acted in bad faith.  Lehr argues that he has shown bad faith because the State, without contacting his counsel, authorized testing that consumed the sticks.  This does not establish bad faith, particularly because the State retained the DNA extracted from the swab sticks and made it available to Lehr for independent testing.

### E.     Juror Conduct

¶43     Several jurors stood and applauded after the State's DNA expert completed his testimony.  Lehr argues that the trial court's refusal to grant a mistrial or to dismiss certain jurors denied him his Sixth Amendment right to a fair and impartial jury.  Trial court rulings on motions for a mistrial or to dismiss jurors are reviewed for abuse of discretion.  *State v. Speer*, 221 Ariz. 449, 462 ¶ 72, 212 P.3d 787, 800 (2009); *State*

*v. Cook*, 170 Ariz. 40, 54, 821 P.2d 731, 745 (1991).

¶44    The record reflects that after the State's DNA expert finished two days of testimony and was excused, "the jury applaud[ed]." Immediately after the applause, the following exchange occurred:

> THE COURT: I'm not going to ask if you are clapping because of his performance or because he's done.
>
> A JUROR: His performance.
>
> THE WITNESS: I'm happy because I'm done. Unless, of course, I'm recalled.

One or more jurors also apparently stood while they applauded.

¶45    Lehr's counsel argued that the applause indicated that some jurors had "begun to make up their mind" and moved for a mistrial. He also asked the trial court to discharge the juror (Juror 5) who said she had clapped for the witness's performance. Noting the jurors' obvious boredom during the witness's testimony the previous day, the trial court remarked that the jurors had likely applauded because "they were just glad he was done." The next day, the trial judge and the court bailiff saw Juror 5 give a "thumbs up" sign to victim E.R. after she testified. Another juror also observed that Juror 5 called out E.R.'s name.

¶46    The court held a hearing that same day to question each juror individually about the clapping and to question Juror 5 about her gesturing to E.R. During examination, Jurors 1, 3,

19

5, 8, and 9 admitted to clapping when the DNA witness finished his testimony. Jurors 1, 3, and 5 admitted to saying that they clapped because of the witness's performance. One juror later stated that another juror said he or she had clapped because "they were glad [the witness] was done." Juror 5 admitted that she called out E.R.'s name and gave a thumbs up to her, explaining that she did it because it was apparent E.R. was having a difficult time and she felt sorry for her. All jurors, whether they clapped or not, affirmed that they could be fair and impartial and had not made up their minds about Lehr's guilt.

¶47    In seeking a mistrial, Lehr argued that the applause was an "act of bias" that "tainted the entire jury" and that at the very least Jurors 1, 3, and 5 should be dismissed. The court denied the motion for mistrial, recognizing that although the applause was inappropriate, all jurors affirmed that "their minds had not been made up," "they could evaluate all witnesses by the same standards," and "they could continue to give Scott Lehr a fair trial and remain open-minded." The State stipulated to Juror 5's removal for cause, and the court accepted the stipulation, stating "I did find her answers much more troubling than anybody else's."

¶48    After closing arguments, Jurors 3, 6, and 12 were selected as alternate jurors. Therefore, of the jurors who

clapped, Jurors 1, 8, and 9 participated in the jury deliberations.

**¶49** Defendants have the right to "an impartial jury." U.S. Const. amend. VI; Ariz. Const. art. 2, § 24. "[E]ven a single partial juror violates a defendant's constitutional right to a fair trial." *United States v. Angulo*, 4 F.3d 843, 848 (9th Cir. 1993). Although a jury must refrain from premature deliberations, "juror misconduct warrants a new trial [only] if the defense shows actual prejudice or if prejudice may be fairly presumed from the facts." *State v. Dann*, 220 Ariz. 351, 371 ¶ 115, 207 P.3d 604, 624 (2009) (internal quotation marks and citation omitted).

**¶50** The trial court carefully questioned all jurors to verify that each remained unbiased and able to provide Lehr a fair trial. The court dismissed the only juror about whom it felt concern. The remaining jurors affirmed their ability to remain fair and impartial and that they had not yet formed an opinion as to Lehr's guilt, and the court accepted their answers. The trial court did not abuse its discretion, and there is no reason to conclude that the applause denied Lehr his right to a fair trial.

**F.    Jury Instruction Defining Premeditation**

**¶51** Lehr argues that the trial court's jury instruction defining premeditation, together with the prosecutor's closing

21

statement about premeditation, violated his Fourteenth Amendment right to due process. "The Court reviews de novo whether a jury instruction accurately reflects the law." *State v. Kiles*, 222 Ariz. 25, 32 ¶ 27, 213 P.3d 174, 181 (2009).

¶52    The trial court here instructed the jury:

> "Premeditation" means that the defendant intended to kill another human being, or knew he would kill another human being, and that after forming that intent or knowledge, reflected on the decision before killing. It is this reflection, regardless of the length of time in which it occurs, that distinguishes first-degree murder from second-degree murder. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion. The time needed for reflection is not necessarily prolonged, and the space of time between the intent or knowledge to kill and the act of killing may be very short.

¶53    During the settling of jury instructions, Lehr objected to the premeditation instruction, arguing that the last sentence was impermissible under *State v. Thompson*, 204 Ariz. 471, 65 P.3d 420 (2003). The trial court found that the facts warranted the final sentence and overruled Lehr's objection.

¶54    During closing argument, the prosecutor stated:

> Premeditation only requires a short period of time to reflect. When you've got a rock and you're using that to strike someone in the head, you have time to think about what you're doing before you strike somebody with that rock. When you pick it up, you form the intent in your mind that you're going to kill someone. And then you pick it up, and you go ahead and you do it, that's premeditation. That's first-degree murder. Once you pull that trigger in your mind that you're going to kill someone, everything else is easy, because then all you have to do is pick it up and hit

22

them with it.

¶55     Lehr argues that the last sentence of the jury instruction was inappropriate because there were no eyewitnesses or other direct evidence of what happened during the murders. He contends that the instruction, together with the State's closing argument, allowed the jury to unconstitutionally convict him without proof of actual reflection.

¶56     The trial court's premeditation instruction was nearly identical to the jury instruction mandated by this Court in *Thompson*. We explained in *Thompson*, however, that courts may use the sentence to which Lehr objected "[o]nly when the facts of a case require it . . . . It is the act of premeditation and not the length of time available that determines the question." 204 Ariz. at 479-80 ¶ 32, 65 P.3d at 428-29. *Thompson* also held that jury instructions on premeditation could not use "the phrase 'proof of actual reflection is not required'" because it "relieves the state of the burden of proving with direct evidence that a defendant reflected." *Id.* Instead, the State must prove "reflection through direct evidence or through circumstantial evidence." *Id*.

¶57     In *Thompson*, we emphasized that the premeditation instruction we approved

> does not mean that the state must rely on direct evidence of premeditation; as we have noted, such evidence is rarely available.     Nor does this

23

instruction mean that the state cannot rely on the passage of time between the formation of intent and the act of killing as a fact tending to show premeditation. This instruction merely clarifies that the state may not use the passage of time as a proxy for premeditation. The state may argue that the passage of time *suggests* premeditation, but it may not argue that the passage of time *is* premeditation.

*Id*. at 480 ¶ 33, 65 P.3d at 429 (alterations in original). "[I]f a court's instruction or a prosecutor's comment to the jury signals that the mere passage of time will suffice to establish the element of premeditation, those instructions or comments constitute error." *Dann*, 205 Ariz. at 565 ¶ 16, 74 P.3d at 239.

¶58    Given the facts of the case, the final sentence of the trial court's jury instruction was appropriate. Lehr is correct that the State offered no direct evidence of premeditation, but the State presented substantial circumstantial evidence. M.C. and M.M. were both killed by blunt force trauma to the head. Near their bodies were bloody rocks, which likely were used to kill the victims. The State did not impermissibly argue that the passage of time was enough to show premeditation. Instead, the State argued that the circumstantial evidence relating to the murders supported a jury finding of premeditation.

¶59    We noted in *Thompson* that "the state may use all the circumstantial evidence at its disposal in a case to prove premeditation," and that "[s]uch evidence might include, among

24

other things . . . the acquisition of a weapon by the defendant before the killing." 204 Ariz. at 479 ¶ 31, 65 P.3d at 428. "The key is that the evidence, whether direct or circumstantial, must convince a jury beyond a reasonable doubt that the defendant actually reflected." *Id.* The jury instruction on premeditation and the State's closing argument complied with *Thompson*.

### G. Amendment of Notice of Aggravating Factors

¶60 Lehr argues that the trial court violated A.R.S. § 13-752 and Rules 13.5 and 15.1(i)(2) of the Arizona Rules of Criminal Procedure by allowing the State to amend its notice of aggravating factors on the eve of the penalty phase.

¶61 Arizona law requires the state to provide the defendant notice, generally within sixty days after arraignment, of its intent to seek the death penalty. Ariz. R. Crim. P. 15.1(i)(1). The state must also identify before trial the particular aggravating circumstances it will rely on in seeking the death penalty. *See* A.R.S. § 13-752(B) (providing that "[b]efore trial, the prosecution shall notice one or more of the aggravating circumstances under § 13-751, subsection F"); Ariz. R. Crim. P. 15.1(i)(2) (directing that upon filing notice of intent to seek the death penalty, "the prosecutor shall at the same time provide the defendant with a list of aggravating circumstances the state will rely on at the aggravating hearing

25

in seeking the death penalty").

¶62    Rule 13.5 of the Rules of Criminal Procedure addresses the amendment of charges. Under Rule 13.5(a), the prosecutor may amend a charging document, subject to the time limits of Rule 16.1(b), "to add an allegation of one or more prior convictions or other non-capital sentencing allegations that must be found by the jury." The charges otherwise "may be amended only to correct mistakes of fact or remedy formal or technical defects, unless the defendant consents to the amendment." Ariz. R. Crim. P. 13.5(b). Capital sentencing allegations are subject to Rule 13.5(c), which states that "[t]he filing of a notice to seek the death penalty with noticed aggravating circumstances shall amend the charging document, and no further pleading needs to be filed."

¶63    Here, after the case was remanded, the State in 2003 filed a "Notice of Aggravating Factors" with respect to each first degree murder charge. This notice identified three aggravating factors: (F)(2), because identified prior convictions were "serious offenses"; (F)(6), because Lehr had committed the offense in an especially heinous, cruel or depraved manner; and (F)(8), because he would have been convicted of one or more other homicides. (As in the 1996 trial, the State contended that each victim's murder was aggravated by the two other murders.) Before the 2009 trial,

26

the State withdrew the (F)(6) and (F)(8) aggravators.

¶64    In March 2009, after the guilt phase, Lehr objected to the penalty phase, arguing that the State had incorrectly characterized some of his prior convictions as "serious offenses" for purposes of the (F)(2) aggravator, when the pre-1993 version of the statute applied only to offenses "involving the use or threat of violence." He also argued that the State had erred in identifying the other murders as a basis for the (F)(8) aggravator. In response, the State acknowledged that it had used incorrect language in referring to the (F)(2) aggravator and incorrectly listed certain prior convictions under (F)(2) or (F)(8) instead of (F)(1).

¶65    Over Lehr's objection, the trial court allowed the State to amend its notice to identify two of the prior convictions listed in the 2003 notice (the aggravated assault convictions regarding victim T.H.) as supporting the (F)(2) aggravator because they involved "the use or threatened use of violence," and to identify some of the other convictions referred to in the 2003 notice, including the other murders and his crimes (which were classified as dangerous crimes against children) against minor victims J.A., E.R., and J.T., as supporting the (F)(1) aggravator because they were crimes punishable by a sentence of death or life imprisonment. The trial court specifically found that, over the preceding twelve

27

years, Lehr had received notice of all the prior convictions the State intended to use as aggravators and that he was not prejudiced by the amendment.

¶66 The State concedes that the amendment of its notice of aggravating factors during trial did not comport with Rule 13.5(b). The mid-trial amendment also did not comply with A.R.S. § 13-752 or Rule 15.1(i)(2). The State argues, however, that the error was harmless, relying on *State v. Freeney*, 223 Ariz. 110, 219 P.3d 1039 (2009).

¶67 In *Freeney*, the trial court violated Rule 13.5(b) by allowing the state to amend the indictment on the first day of trial to change the nature of the charged offense. 223 Ariz. at 111 ¶ 2, 219 P.3d at 1040. This Court held, however, that a violation of Rule 13.5(b) is neither structural error nor prejudicial per se. *Id.* at 114 ¶ 26, 219 P.3d at 1043. Instead, because Freeney had objected to the improper amendment, the Court reviewed for harmless error. *Id.*

¶68 Lehr argues that *Freeney*'s harmless error analysis should not be extended to an improper amendment regarding notice of aggravating circumstances in a capital case. We disagree. Most trial errors, including constitutional errors, are not structural. *Id*. at 114 ¶ 23, 219 P.3d at 1043. *Cf. State v. Cropper*, 205 Ariz. 181, 184 ¶ 15, 68 P.3d 407, 410 (2003) (holding that State's failure to provide written notice of

intended aggravating factor under prior version of Rule 15.1 was not reversible error when defendant had timely actual notice and was not prejudiced); *State v. Ring,* 204 Ariz. 534, 554 ¶ 50, 65 P.3d 915, 935 (2003) (holding that harmless error analysis applies to failure to submit the aggravating circumstance element of capital murder to a jury).

¶**69** Under harmless error analysis, to avoid a reversal, the state must establish that an error was harmless beyond a reasonable doubt. *Freeney*, 223 Ariz. at 114 ¶ 26, 219 P.3d at 1143. The State has met its burden here. As the trial court correctly concluded, Lehr had notice of the prior convictions the State intended to use as aggravating circumstances. The error in the 2003 notice was incorrectly identifying which statutory aggravator would be supported by those convictions and failing to quote the applicable version of the (F)(2) aggravator.

¶**70** Lehr also was not prejudiced by the amendment of the notice of aggravating factors. He contends that the amendment improperly allowed the murders to serve as an (F)(1) aggravator when they could not have validly qualified as aggravators under (F)(2). This argument, however, misperceives the prejudice analysis. The issue is not whether the amendment subjects the defendant to an aggravating factor (or, as in *Freeney*, a charged offense) different from that alleged before the amendment, but

instead whether the amendment somehow prejudices the defendant's "litigation strategy, trial preparation, examination of witnesses, or argument." *Freeney*, 223 Ariz. at 115 ¶ 28, 219 P.3d at 1044. Given that Lehr had notice of the particular offenses, including the other murders, that the State would contend established aggravating circumstances, and never suggested that the amendment affected his defense in the sentencing phase, we conclude that the procedurally improper amendment of the notice of aggravating factors was harmless beyond a reasonable doubt. Nor did the amendment violate Lehr's rights under the Sixth Amendment. *Cf. id.* at 115 ¶¶ 29-30, 219 P.3d at 1044 (noting that same factors leading Court to find Rule 13.5(b) violation harmless supported conclusion that Sixth Amendment rights were not violated).

### H. Victim Testimony Opposing Death Penalty

¶71 During the penalty phase, the trial court precluded Lehr from offering testimony from one of his victims, T.H., about her opposition to the death penalty. Lehr argues that the court prevented him from presenting all available mitigating circumstances to the jury in violation of the Eighth Amendment.

¶72 We review "evidentiary rulings for an abuse of discretion." *Andriano*, 215 Ariz. at 502 ¶ 17, 161 P.3d at 545. As noted above, in his 1996 trial, Lehr was convicted of two counts of aggravated assault regarding victim T.H. At the 2009

30

retrial, T.H. refused to testify because she opposed the death penalty. During the penalty phase, Lehr's counsel sought to introduce T.H.'s 2009 hearing testimony explaining her refusal to testify. The trial court precluded Lehr from offering this evidence.

¶73    The trial court did not err. "[A] victim's recommendation of what sentence should be imposed in a capital case, whether for or against the death penalty, is simply not relevant." *State v. Glassel*, 211 Ariz. 33, 55 ¶ 91, 116 P.3d 1193, 1215 (2005). We reject Lehr's argument that although sentencing recommendations by victims of the capital offense are not admissible, such testimony should be allowed from victims of non-capital offenses who oppose the death penalty. Such testimony is not relevant for purposes of either A.R.S. § 13-751(C) (allowing defendant to "present any information that is relevant to any [] mitigating circumstances") or the Eighth Amendment. *See Glassel,* 211 Ariz. at 55 ¶ 91, 116 P.3d at 1215.

    **I.    Independent Review**

¶74    Because the murders occurred before August 1, 2002, this Court independently reviews the "findings of aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13-755(A); *see* 2002 Ariz. Sess. Laws, ch. 1, § 7(B) (5th Spec. Sess.). We review the record de novo and do not defer to the jury's findings or decisions. *State v. Newell*, 212 Ariz. 389,

405 ¶ 82, 132 P.3d 833, 849 (2006).

### 1. Aggravating Circumstances

**¶75** The jury found two aggravating circumstances for M.M.'s and M.C.'s murders: Lehr had been "convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable," A.R.S. § 13-703(F)(1) (1991), and he had been "previously convicted of a felony in the United States involving the use or threat of violence on another person." *Id.* § 13-703(F)(2).

**¶76** These aggravators were proved beyond a reasonable doubt. For each of the murder victims, Lehr's convictions for murdering the other two victims establish the (F)(1) aggravator; his prior convictions for kidnappings and sexual assaults of victims J.A., J.T., and E.R. also establish the (F)(1) aggravator. The (F)(2) aggravator is established based on Lehr's two aggravated assault convictions regarding victim T.H.

### 2. Mitigating Circumstances

**¶77** Lehr presented evidence to show that a natural life sentence would be a viable alternative to the death penalty because he has been sentenced to at least 716 years imprisonment for his non-capital convictions, he has been a well-behaved inmate with few disciplinary problems, and he poses little risk of violent conduct in prison.

**¶78** That Lehr would remain imprisoned for his natural life

if he is not sentenced to death is of little mitigating weight. We also accord minimal weight to the prospect that he will be a "model prisoner." All prisoners are expected to behave in prison. *Kiles*, 222 Ariz. at 42 ¶ 89, 213 P.3d at 191.

¶79     Lehr also notes that the trial court in 1996 found that he had proved several non-statutory mitigating circumstances by a preponderance of the evidence. The court found that Lehr "was a good father to his children, a good husband to his wife, a good son to his mother; he had no prior record of criminal behavior or accusations of violence of any kind," and he had been a "'model prisoner' while in custody." In *Lehr I*, this Court accepted and approved these findings. 201 Ariz. at 523-24 ¶ 65, 38 P.3d at 1186.

¶80     The State argues that we should not consider mitigation evidence from the 1996 trial that was not introduced at the 2009 retrial. In our independent review of aggravating circumstances, we have declined "to consider evidence that the sentencing jury did not hear," *State v. Ellison*, 213 Ariz. 116, 142 ¶ 121 n.19, 140 P.3d 899, 925 n. 19 (2006), and the State contends we should similarly limit our consideration of mitigation evidence in the penalty phase. Even considering the evidence identified by Lehr from the 1996 trial, however, we find it is not significantly mitigating.

### 3. Propriety of Death Sentence

¶81      In reviewing the propriety of the death sentence, this Court considers the quality and the strength, not simply the number, of aggravating and mitigating factors. *Glassel,* 211 Ariz. at 55 ¶ 93, 116 P.3d at 1215. The (F)(1) and (F)(2) aggravators were established beyond a reasonable doubt. The mitigation is not sufficiently substantial to warrant leniency.

### J.      Preservation of Issues for Federal Review

¶82      To avoid preclusion, Lehr lists twenty-six additional constitutional claims that he states have been rejected in previous decisions. The appendix lists these claims and the decisions Lehr identifies as rejecting them.

### CONCLUSION

¶83      We affirm Lehr's convictions and sentences.


_____
W. Scott Bales, Justice


CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
A. John Pelander, Justice

_____
Robert M. Brutinel, Justice


_____
Patricia A. Orozco, Judge*



* Justice Andrew D. Hurwitz has recused himself from this case. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Patricia A. Orozco, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

**APPENDIX**

Lehr raises twenty-six issues to preserve them for federal appeal. This Appendix lists verbatim his claims and the decisions he identifies as rejecting them.

(1)     The death penalty is *per se* cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 186–87 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

(2)     Execution by lethal injection is *per se* cruel and unusual punishment. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

(3)     Arizona's death penalty statutory scheme is unconstitutional because it permits jurors unfettered discretion to impose death without adequate guidelines to weigh and consider appropriate factors and fails to provide principled means to distinguish between those who deserve to die or live. *State v. Johnson*, 212 Ariz. 425, 440, ¶ 69, 133 P.3d 735, 750 (2006).

(4)     The statute unconstitutionally fails to require the cumulative consideration of multiple mitigating factors or require that the jury make specific findings as to each mitigating factor. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995).

(5)     Arizona's death statute is unconstitutional because there are no statutory standards for weighing. *State v. Atwood*, 171 Ariz. 576, 645–46 n. 21(4), 832 P.2d 593, 662–63 n. 21(4) (1992).

(6)     The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. *State v. Cromwell*, 211 Ariz. 181, 192, ¶ 58, 119 P.3d 448, 459 (2005).

(7)     Death sentences in Arizona have been applied arbitrarily and irrationally and in a discriminatory manner against impoverished males whose victims have been Caucasian. *State v. West*, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993); *State v. Sansing*, 200 Ariz.

347, 361, ¶ 46, 26 P.3d 1118 (2001).

(8)     The Constitution requires a proportionality review of a defendant's death sentence. *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995).

(9)     Subjecting Appellant to a second trial on the issue of aggravation and punishment before a new jury violates the double jeopardy clause of the Fifth Amendment. *State v. Ring* (*Ring III*), 204 Ariz. 534, 550, ¶ 39, 65 P.3d 915 (2003).

(10)    Appellant's death sentence is in violation of his rights to a jury trial, notice and due process the Fifth, Sixth and Fourteenth Amendments since he was not indicted for a capital crime. *McKaney v. Foreman*, 209 Ariz. 268, 271, ¶ 13, 100 P.3d 18, 21 (2004).

(11)    Imposition of a death sentence under a statute not in effect at the time of Appellant's trial violates due process under the Fourteenth Amendment. *State v. Ellison*, 213 Ariz. 116, ¶ 85, 140 P.3d 899 (2006).

(12)    The absence of notice of aggravating circumstance prior to Appellant's guilt phase trial violated the Sixth, Eighth and Fourteenth Amendments. *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 347, ¶¶ 79-80, 82, 111 P.3d 369 (2005).

(13)    The reasonable doubt jury instruction at the aggravation trial lowered the state's burden of proof and deprived Appellant of his right to a jury trial and due process under the Sixth and Fourteenth Amendments. *State v. Dann* (*Dann I*), 205 Ariz. 557, 575-76, ¶ 74, 74 P.3d 231 (2003).

(14)    Arizona's death statute creates an unconstitutional presumption of death and places an unconstitutional burden on Appellant to prove mitigation is "sufficiently substantial to call for leniency." *Walton v. Arizona*, 497 U.S. 639, 648 (1990); *State v. Glassel*, 211 Ariz. 33, 52, ¶ 72, 116 P.3d 1193, 1212 (2005).

(15)    The failure to provide the jury with a special verdict on Appellant's proffered mitigation deprived him of his rights to not be subject to ex post facto

legislation and right to meaningful appellate review. *State v. Roseberry*, 210 Ariz. 360, 373, ¶ 74 & n.12, 111 P.3d 402 (2005).

(16)     The trial court improperly omitted penalty phase instructions that the jury could consider mercy or sympathy in evaluating the mitigation evidence and determining whether to sentence the defendant to death. *State v. Carreon*, 210 Ariz. 54, 70-71, ¶¶ 81-87, 107 P.3d 900, 916-17 (2005).

(17)     Arizona's *current* protocols and procedures for execution by lethal injection constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *State v. Andriano*, 215 Ariz. 497, ¶¶ 61-62, 161 P.3d 540 (2007).

(18)     The jury instruction that required the jury to unanimously determine that the mitigating circumstances were "sufficiently substantial to call for leniency" violated the Eighth Amendment. *State v. Ellison*, 213 Ariz. 116, ¶¶ 101-02, 140 P.3d 899 (2006).

(19)     The failure to instruct the jury that only murders that are "above the norm" may qualify for the death penalty violates the Sixth, Eighth and Fourteenth Amendments. *State v. Bocharski* (*Bocharski II*), 218 Ariz. 476, ¶¶ 47-50, 189 P.3d 403 (2008).

(20)     The refusal to permit *voir dire* of prospective jurors regarding their views on specific aggravating and mitigating circumstances violates Appellant's rights under the Sixth and Fourteenth Amendments. *State v. Johnson*, 212 Ariz. 425, 440, ¶¶ 29-35, 133 P.3d 735, 750 (2006).

(21)     The refusal to permit Appellant to argue or the jury to consider whether his death sentence would be proportional to other similarly situated defendants violated his rights under the Eighth and Fourteenth Amendments. *State v. Johnson*, 212 Ariz. 425, 431-32, ¶¶ 19-20, 133 P.3d 735, 750 (2006).

(22)     Refusing to instruct the jury or permit the introduction of evidence and argument regarding residual doubt violated Appellant's rights under the

Sixth, Eighth and Fourteenth Amendments and Arizona law. *State v. Harrod* (*Harrod III*), 218 Ariz. 268, ¶¶ 37-39, 183 P.3d 519 (2008); *State v. Garza*, 216 Ariz. 56, 70, ¶ 67, 163 P.3d 1006 (2007).

(23)     The penalty phase jury instructions that advised the jury they "must" return a death sentence in various circumstances and forms of verdict impermissibly shifted the burden of proof to the defendant and created a presumption of death. *State v. Tucker* (*Tucker II*), 215 Ariz. 298, 317, 160 P.3d 197 (2007).

(24)     Arizona's death penalty scheme violates Appellant's right to equal protection under the Fourteenth Amendment since it fails to require the jury to make specific findings of fact and conclusions of law reviewable on appeal. *State v. Dann* (*Dann III*), 220 Ariz. 351, ¶¶ 127-28, 207 P.3d 604 (2009).

(25)     Arizona's death penalty scheme violates Appellant's rights under the Eighth and Fourteenth Amendments by not requiring that once a defendant proves mitigating circumstances exist that the State prove beyond a reasonable doubt that the mitigation is not sufficiently substantial to call for leniency and that death is the appropriate sentence. *State v. Dann* (*Dann III*), 220 Ariz. 351, ¶¶ 94-95, 207 P.3d 604 (2009).

(26)     The death penalty is an irreversible denial of human rights and international law. *State v. Richmond*, 136 Ariz. 312, 322, 666 P.2d 57 (1983).