NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

ANAISHA JOHNSON, *Appellant*.

No. 1 CA-CR 23-0191

FILED 07-18-2024

Appeal from the Superior Court in Maricopa County
No. CR2021-145175-001
The Honorable Sam J. Myers, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Tucson
By Tanja K. Kelly
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jesse Finn Turner
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Paul J. McMurdie joined.

---

**C A M P B E L L**, Judge:

¶1        Anaisha Johnson appeals her conviction and sentence for manslaughter. She challenges evidentiary rulings and the denial of her motion for a new trial. We affirm.

## BACKGROUND

¶2        Johnson was tried by jury for second-degree murder of her live-in boyfriend, Leon Washington.[1] She asserted self-defense and crime-prevention defenses.

¶3        At trial, the evidence showed that in mid-April 2021, Washington left the house after an argument with Johnson. Later, Washington returned with a friend, Mark Kennedy, to pick up his belongings. Washington and Johnson resumed arguing as he collected his things, with the pair eventually moving the argument to the garage. There, Washington was shot; the bullet traveled through his chest and out the other side.

¶4        Washington's minor son Kameron saw his father leave the garage empty-handed and bleeding, with Johnson, also empty-handed, following. Johnson said that Washington had shot himself, and she instructed her daughter, who had come running from elsewhere in the house, to call 911. Johnson helped Washington out of the house and tried to render aid.

¶5        Meanwhile, Kennedy called 911. Kennedy told the dispatcher he had been outside and had not seen anything, but he believed Washington had shot himself. An unidentified female also called 911, but she was screaming and provided little information. Neighbors reported hearing a voice repeatedly screaming at someone—one neighbor heard someone say "mom"—to leave because the police were coming.

---

[1]        We use pseudonyms for the victim and witnesses.

¶6          Police officers arrived and helped Washington, who at that point was in severe medical distress and incapable of intelligible speech. He was transported to a hospital for further medical care but died soon after arriving.

¶7          Kennedy directed the officers to a .45 caliber handgun wedged in a pantry cupboard. According to Kennedy, Washington asked him to put the gun away immediately after the shooting.

¶8          Kennedy told officers he heard a tussle and was outside the house when he heard the gunshot. But at trial, Kennedy—who admitted he communicated with Johnson after the shooting—changed his story. At trial, he testified that he saw Washington follow Johnson into the garage, where he "got on her" with a gun as she sat in her parked car and fought with her over the gun. He also testified for the first time that he heard Johnson tell Washington to stop and get off her and that after the shooting, Washington was holding his gun in his hand and saying that he had "fucked up."

¶9          Washington's son Kameron also stated for the first time at trial that he peeked into the garage right before the shooting and saw Johnson grab her bag from her car. Johnson was known to carry a gun in her bag. Police found the bag in the car and found a 9mm handgun on top of a dryer in the garage. This gun had one spent casing stuck inside it, indicating it had been fired.

¶10          Johnson was transported to a hospital soon after the police arrived because she reported chest pains and vaginal bleeding. At the hospital, she told police "it" had happened fast, she had done nothing, and she thought Kennedy would know what happened. She denied any children had been present and told police to check the house cameras. Though police saw no visible injuries on Johnson, they testified she appeared to be in pain, and she and received treatment for a "medical event." Johnson sought to elicit trial testimony from a detective that the medical event was a miscarriage, but the court ruled that the nature of the event was irrelevant.

¶11          Police determined that the house cameras had been unplugged and contained no recordings of the relevant period. Forensic testing revealed both Johnson's and Washington's DNA on the 9mm gun, and Johnson's DNA beneath one of Washington's fingernails. Additional tests revealed that Washington was shot from several feet away and thus his wound was not self-inflicted. Although there was no gunshot residue on Johnson's bloody shirt, an analyst explained this did not exclude the

possibility that Johnson was near the discharge of a gun, acknowledging that residue may not land on a shooter and blood may mask residue.

¶12 The medical examiner testified that Washington died from the gunshot wound and that toxicology tests revealed no additional contributors to his death. Important to this appeal, Johnson sought to elicit testimony from the medical examiner regarding the results of those tests: specifically, that Washington had a marijuana element, Delta-9 THC, in his system. Johnson argued this information was relevant to self-defense because Kennedy and Kameron both testified about a fight, and Delta-9 THC has depressant and reality-distorting effects. Johnson also stated she would not call an expert. The court precluded the toxicology results as irrelevant but held that the issue could be reopened if Johnson testified about Washington's behavior that day. Johnson elected not to testify, and the court was never asked to revisit the issue.

¶13 The jury was instructed on second-degree murder, manslaughter as a lesser-included offense, and self-defense and crime-prevention as defenses. The jury found Johnson guilty of manslaughter. The jury found that the crime was a domestic violence offense and that two aggravators were proved: use of a deadly weapon and harm to the victim or his family.

¶14 Johnson moved for a new trial, challenging the sufficiency of the evidence and the evidentiary rulings regarding the miscarriage and the toxicology results. The court denied the motion, entered judgment on the jury's verdict, and sentenced Johnson to nine years in prison. Johnson appealed.

## DISCUSSION

¶15 Johnson makes three arguments on appeal: (1) the court erred by precluding evidence of the Delta-9 THC in the victim's system; (2) the court erred by precluding evidence of her miscarriage; and (3) she was entitled to a new trial because the verdict was contrary to the weight of the evidence.

## I. Preclusion of Toxicology Results

¶16 We first address the preclusion of the toxicology results as irrelevant. Evidence is relevant, and therefore generally admissible, if it tends to make a fact of consequence more or less probable. Ariz. R. Evid. 401, 402. But even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing

the issues, [or] misleading the jury." Ariz. R. Evid. 403. We review the court's rulings on the admissibility of evidence for abuse of discretion. *State v. Lehr*, 227 Ariz. 140, 147, ¶ 19 (2011).

**¶17**         When a defendant asserts a justification defense, evidence that the victim was intoxicated may be relevant to explain the victim's behavior—for example, it may be relevant if other evidence shows the victim was the first aggressor. *See State v. Plew*, 155 Ariz. 44, 46–47 (1987); *State v. Randles*, 235 Ariz. 547, 551, ¶ 19 (App. 2014); *see also State v. Krantz*, 174 Ariz. 211, 213 (App. 1992). Here, however, no evidence showed that Washington instigated violence or was otherwise acting like he was impaired. Kennedy described Johnson and Washington's interaction preceding the shooting as a "[t]ypical argument," and Kameron confirmed that the two often argued. And though Kennedy testified that Washington "got on" Johnson with a gun in the garage and that Johnson yelled for him to get off her, he did not describe how or why that occurred in the context of the altercation.

**¶18**         On this record, where no evidence suggested the Delta-9 THC in Washington's system impacted his behavior in a manner relevant to support a justification defense, the court acted within its discretion by precluding the toxicology results. *See* Ariz. R. Evid. 401, 402. Further, even if the evidence were relevant, it could properly be precluded as unfairly prejudicial, as marginally relevant, and as potentially confusing given the stigma of drug use. *See* Ariz. R. Evid. 403. Because there was no evidence that drug use affected Washington's behavior, we need not address Johnson's assertion that expert testimony is not necessary to assess the effect of marijuana on behavior.

## II.     Preclusion of Miscarriage Evidence

**¶19**         We next address the preclusion of evidence of Johnson's miscarriage as irrelevant. Again, we review the evidentiary ruling for abuse of discretion. *Lehr*, 227 Ariz. at 147, ¶ 19.

**¶20**         Johnson argues that evidence of her miscarriage was relevant to show that she was injured and being truthful. But the State's evidence confirmed that she was telling the truth about needing medical care. Police testified that though they saw no visible injuries, she appeared to be in pain, and she required treatment for a "medical event." That the medical event was a miscarriage (as Johnson stated in her opening statement) did not make any fact of consequence more or less probable, so the court did not abuse its discretion by precluding the particularized description. *See* Ariz.

R. Evid. 401, 402. Additionally, even if the nature of Johnson's medical event were relevant, the evidence could properly be precluded as unfairly prejudicial, marginally relevant, and potentially confusing given the highly sensitive nature of a miscarriage. *See* Ariz. R. Evid. 403. We also note that the jury was aware of the nature of the medical event because it was spelled out in Johnson's opening statement. We therefore affirm the preclusion ruling.

## III.     Denial of New Trial–Sufficiency of the Evidence

**¶21**          Finally, we address the denial of Johnson's request for a new trial based on the weight of the evidence. "The court may grant a new trial . . . if . . . the verdict is contrary to law or the weight of the evidence." Ariz. R. Crim. P. 24.1(c). Though the superior court may not simply substitute its judgment for that of the jury, it may independently weigh the evidence and assess credibility. *State v. Fischer*, 242 Ariz. 44, 50–51, ¶¶ 21, 23–25 (2017). On appellate review, however, we do not weigh the evidence. *Id.* at 52, ¶ 28. Instead, we "determine whether, resolving every conflict in the evidence in support of the order, substantial evidence supports the trial judge's order." *Id.* We will not disturb the superior court's ruling absent a manifest abuse of discretion. *Id.* at 51, ¶¶ 26–27.

**¶22**          Johnson argues the State failed to prove manslaughter and to disprove self-defense and crime-prevention. The State must prove every element of an offense beyond a reasonable doubt. *State v. Jensen*, 153 Ariz. 171, 176 (1987). And when a defendant establishes a justification defense (such as self-defense or crime-prevention) by a preponderance of the evidence, the State must disprove justification beyond a reasonable doubt. A.R.S. § 13-205(A).

**¶23**          The crime of manslaughter requires, as relevant here, proof that the defendant caused the victim's death intentionally, knowingly, or under circumstances showing an extreme indifference to human life on a sudden quarrel or heat of passion resulting from adequate provocation by the victim. A.R.S. §§ 13-1103(A)(2), -1104(A). Self-defense justifies the defendant's conduct if she used physical force "when and to the extent a reasonable person would believe that physical force is immediately necessary to protect h[er]self against the other's use or attempted use of unlawful physical force." A.R.S. § 13-404(A). Crime-prevention justifies the defendant's conduct "to the extent [she] reasonably believes that physical force or deadly force is immediately necessary to prevent the other's commission of" certain crimes, including homicide and aggravated assault. A.R.S. § 13-411(A).

6

**¶24** We find no abuse of discretion in the court's determination that sufficient evidence showed Johnson committed manslaughter and that her actions lacked justification. Evidence showed Washington and Johnson entered the garage together arguing, and Johnson then retrieved her bag—in which she was known to carry a gun—from her car. Then, with nobody else present, Washington was shot with a gun of a different caliber than his own. Experts testified the fatal shot was made from a distance of several feet and was not self-inflicted.

**¶25** To be sure, Kennedy testified he saw Washington "g[e]t on" Johnson with a gun and heard her yell at him to get off her. But he told a different story to the 911 dispatcher and police immediately after the incident. Further, when Johnson spoke to officers that day, she did not claim self-defense. Instead, she claimed ignorance about what happened and directed them to Kennedy and to the cameras that had been unplugged. And though Johnson emphasizes the absence of gunshot residue on her shirt, the analyst explained this did not necessarily mean she was not in the presence of a gunshot. On this record, the court properly determined the jury's verdict was not contrary to the weight of the evidence.

## CONCLUSION

**¶26** We affirm Johnson's conviction and sentence.

