IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

### STATE OF ARIZONA,
*Appellee,*

*v.*

### SHAWN PATRICK LYNCH,
*Appellant.*

No. CR-12-0359-AP
Filed September 10, 2015

Appeal from the Superior Court in Maricopa County
The Honorable Karen L. O'Connor, Judge
No. CR2001-092032
**AFFIRMED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Lacey Stover Gard (argued), Chief Counsel, Capital Litigation Section, Jeffrey L. Sparks, Assistant Attorney General, Tucson, Attorneys for State of Arizona

Tennie B. Martin, Mikel Steinfeld (argued), Deputy Public Defenders, Phoenix, Attorneys for Shawn Patrick Lynch

JUSTICE BRUTINEL authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BERCH and TIMMER joined.

JUSTICE BRUTINEL, opinion of the Court:

¶1 Shawn Patrick Lynch was convicted of first-degree murder, kidnapping, armed robbery, and burglary. He was sentenced to death for the murder and to twenty-one years' imprisonment for the other offenses. We remanded for a new penalty-phase proceeding on the murder conviction in *State v. Lynch* (*Lynch I*), 225 Ariz. 27, 43 ¶ 89, 234 P.3d 595, 611 (2010). On resentencing, the jury again returned a death verdict. We have jurisdiction over this automatic appeal pursuant to Article 6, Section 5(3) of the Arizona Constitution and A.R.S. §§ 13-755 and 13-4031.

## I. FACTUAL BACKGROUND

¶2 The victim, James Panzarella, was seen at a Scottsdale bar with Lynch and Michael Sehwani on March 24, 2001. Lynch, Sehwani, and Panzarella went to Panzarella's residence early the next morning. Later that morning, Sehwani used Panzarella's American Express card at a supermarket. Ten minutes later, the card was reported lost. Sehwani again used the card at a convenience store and unsuccessfully attempted to use it at a department store. The same day, Panzarella's Bank One card was used at a restaurant, a convenience store, and a motel. The Bank One card was used the following day to make a cash withdrawal and various purchases, including Everlast shoes.

¶3 The next afternoon, Panzarella was found in his home tied to a chair with his throat slit. Police also found credit card receipts from purchases made that morning at a supermarket and convenience store.

¶4 Police arrested Lynch and Sehwani that afternoon as they entered a truck in a motel parking lot. Sehwani was wearing Everlast shoes and had Panzarella's credit cards and checks in his wallet. In the truck and a motel room, police found keys to Panzarella's car, a sweater with Panzarella's blood on it, and a .45 caliber pistol belonging to Panzarella. Blood on Lynch's shoes matched Panzarella's DNA.

¶5 A jury found Lynch guilty of first-degree murder, armed robbery, burglary, and kidnapping. In his first aggravation-phase trial, the jury made separate findings that the murder was especially heinous and cruel, but could not agree on whether it was especially depraved. *See* A.R.S. § 13-751(F)(6). The jury also could not decide if the murder was committed in expectation of pecuniary gain. *See* A.R.S. § 13-751(F)(5). That jury did not reach a unanimous verdict in the penalty phase. A second penalty-

phase jury found that the murder was especially depraved and committed for pecuniary gain and that a death sentence was appropriate. We remanded for a new penalty-phase trial because the trial judge erroneously instructed the second penalty-phase jury that the (F)(6) aggravator constituted three separate aggravating circumstances. *Lynch I*, 225 Ariz. at 42–43 ¶¶ 82–89, 234 P.3d at 610–11. Following the new penalty-phase trial, Lynch was again sentenced to death.

## II.    ISSUES ON APPEAL

### A.  Prosecutorial Misconduct

¶6         Lynch asserts that the State engaged in prosecutorial misconduct in several ways, individually and in combination. "This Court will reverse a conviction for prosecutorial misconduct only when (1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial." *State v. Martinez*, 218 Ariz. 421, 426 ¶ 15, 189 P.3d 348, 353 (2008) (internal quotation marks omitted). Even when an instance of prosecutorial misconduct does not warrant reversal, "an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *State v. Roque*, 213 Ariz. 193, 228 ¶ 155, 141 P.3d 368, 403 (2006) (citations and internal quotation marks omitted).

¶7         When a defendant fails to object to an alleged incident of prosecutorial misconduct in the trial court, this Court reviews for fundamental error. *Id.* at 228 ¶ 154, 141 P.3d at 403. To establish fundamental error, Lynch must show that "there was error that went to the foundation of his case and denied him a fair trial, and that he was, in fact, prejudiced by the error." *State v. VanWinkle*, 230 Ariz. 387, 393 ¶ 25, 285 P.3d 308, 314 (2012).

#### 1.  Argument during opening statements

¶8         Lynch first asserts the prosecutor improperly presented arguments during his opening statement that "largely focused on persuading the jury that little weight should be given to certain mitigating

factors and expected evidence." The trial court sustained two of Lynch's objections to the State's opening statement—that Lynch's childhood should not be considered a mitigating circumstance because "it happened 30 years ago" and that the defense wanted to "pull at [the jury's] heart strings" in its presentation of mitigating evidence. The court overruled Lynch's objection to the prosecutor's remark that no medical records supported Lynch's assertion that his father intentionally burned his hand as a child. Finally, the State implied that little weight should be given to a defense expert's life-expectancy testimony because the expert relied on a Wikipedia article and Lynch had outlived the expert's prediction for his life expectancy. The trial judge overruled Lynch's objection to these remarks.

¶9        "Opening statement is counsel's opportunity to tell the jury what evidence they intend to introduce. Opening statement is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted." *State v. Bible*, 175 Ariz. 549, 602, 858 P.2d 1152, 1205 (1993) (internal citation omitted). "[C]autionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements," because we presume that jurors follow the court's instructions. *State v. Manuel*, 229 Ariz. 1, 6 ¶ 24, 270 P.3d 828, 833 (2011).

¶10        Here, the court instructed the jury that it should only consider testimony, exhibits, and stipulations as evidence and that attorneys' remarks are not evidence. As to the disallowed statements listed above, the trial judge sustained objections and properly instructed the jury not to consider them as evidence. These instructions cured any prejudice. On balance, although the prosecutor improperly made argumentative statements during opening, we find no reasonable likelihood that the misconduct affected the jury's verdict. *See Martinez*, 218 Ariz. at 426 ¶ 15, 189 P.3d at 353. The State's opening statement did not deny Lynch a fair trial.

### 2. Improper witness examination

¶11        Lynch argues that the prosecutor committed misconduct during his cross-examination of defense witnesses. The trial court sustained Lynch's objections to two questions that were asked and answered, the State's interruption of defense witnesses on two occasions, the State's comment to a defense expert that she should "just answer my

4

question for once," and other argumentative questions. The judge overruled Lynch's objections to combative remarks, including, "No, let me ask you the question."

¶12 Although the State's cross-examination was aggressive, and the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner, the questioning did not deny Lynch a fair trial. *See State v. Bolton*, 182 Ariz. 290, 308, 896 P.2d 830, 848 (1995) ("The questioning may have been argumentative. Nevertheless, the misconduct was not so egregious that it permeated the entire trial and probably affected the outcome."). As in *Bolton*, "the prosecutor here did not call defendant pejorative names, refer to matters not in evidence, suggest unfavorable matter for which no proof exists, or abuse defendant in any other way." *Id.* The court instructed the jury to disregard questions to which objections were sustained; to only consider testimony, exhibits, and stipulations as evidence; and that attorneys' remarks are not evidence. We presume that jurors follow instructions. *Manuel*, 229 Ariz. at 6 ¶ 25, 270 P.3d at 833 (presuming that jury followed instructions even though the prosecutor "aggressively cross-examined" the defendant and another witness). We do not find fundamental error in the examination as a whole. As for the remarks to which Lynch's objections were overruled, while the trial court should have exercised more control over the aggressive questioning, the court did not abuse its discretion in overruling the objections.

### 3. Questions related to veracity of other witnesses

¶13 Lynch argues that the State improperly questioned his expert, Dr. Jolie Brams, a clinical psychologist, on the veracity of other witnesses' statements by accusing her of vouching for witnesses and asking her to comment on the truthfulness of witnesses. "Arizona prohibits lay and expert testimony concerning the veracity of a statement by another witness" because it is the province of the jury to determine veracity and credibility, "and opinions about witness credibility are 'nothing more than advice to jurors on how to decide the case.'" *State v. Boggs*, 218 Ariz. 325, 335, 185 P.3d 111, 121 (2008) (quoting *State v. Moran*, 151 Ariz. 378, 383, 728 P.2d 248, 253 (1986)).

¶14 Brams interviewed several people who knew Lynch and, based in part on those interviews, concluded that Lynch grew up in an

atmosphere of violence and neglect. During cross-examination, the State asked Brams to recount her testimony in another criminal trial in which she had testified that it was highly unlikely that the witness could have remembered previous encounters with a defendant absent some meaningful event and that the witness' recollections were the result of suggestions by law enforcement. The State then asked Brams if testifying about recollected memories is "really just vouching for what somebody is saying" and if she had opined that a witness was not truthful in a third case. Lynch did not object to either question, and Brams answered both questions in the negative. Contrasting her testimony in the previous case to Brams's interview of Lynch's uncle, the prosecutor asked Brams whether a witness was not credible if he said he remembered something that happened forty-nine years earlier even though it did not stand out in his mind, "because you can vouch for people[.]" The trial court sustained Lynch's objection. The State also asked, "[Y]ou are telling us that, for example, [Lynch's sister], in your opinion, was telling the truth about everything?" Lynch failed to object to this question, and Brams replied that she did not think the sister was being purposefully deceitful.

**¶15**        These questions did not deny Lynch a fair trial. They related to Brams's witness interviews, not the testimony of other witnesses. These interviews were the foundation for Brams's testimony. The prosecutor did not encroach on the jury's evaluation of witness veracity, but rather tested Brams's credibility by attempting to show that she believed interviewees when their story was helpful but was skeptical when their story was not helpful. The State's closing argument addressed Brams's bias and credibility, not her opinion as to the veracity of testimony. The only improper remark was the suggestion that Brams "can vouch for people," and the trial court sustained Lynch's objection and instructed the jury that it was to disregard questions to which objections were sustained. The jury instructions sufficiently cured any prejudice. *See State v. Hardy*, 230 Ariz. 281, 293–94 ¶¶ 61–62, 283 P.3d 12, 24–25 (2012).

### 4. Speaking objections

**¶16**        Lynch asserts that the prosecutor improperly made arguments through speaking objections. While making a relevance objection, the State argued that Brams was "obviously vested." After Lynch made a relevance objection to the State's cross-examination of Dr. Gerald Altschuler—a hematologist, oncologist, and internist—the State responded

that Altschuler "is a jack of all trades and not a master of this." While making a relevance objection to what a witness recalled, the State said, "If he wants to just ask him what is in the transcript, I have no objection to that but what he remembers is irrelevant." The State also clarified the basis for a "cumulative" objection after the judge replied, "I'm sorry?" Finally, the prosecutor suggested that the jury be given an interview transcript in lieu of testimony as to what the transcript contained. Lynch did not object to any of these comments at trial. Lynch takes issue with the State twice objecting to his speaking objections, once in the presence of the jury, asserting that the State made speaking objections throughout the trial but did not allow him to do so.

¶17          Arizona law does not explicitly prohibit speaking objections, but "[t]o the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Ariz. R. Evid. 103(d). Lynch does not identify—and we have not found—any inadmissible evidence that the State incorporated into its speaking objections. Further, Lynch did not object at trial and fails to demonstrate fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

### 5. Attacks on defense experts

¶18          Lynch contends that the prosecutor committed misconduct by unfairly attacking his expert witnesses. During opening statements, the State told the jury that Altschuler, Lynch's expert regarding his hepatitis C diagnosis, would testify about the Child–Pugh standard for evaluating chronic liver disease. The prosecutor opined that the Child–Pugh standard is a subjective standard that "comes from Wikipedia"[1] and pointed out that Lynch had already outlived the two-year life expectancy Altschuler had given. In response to a defense objection, the trial court commented that the jury had been informed that the opening statement was not evidence, but did not rule on the objection. During Altschuler's cross-examination, the prosecutor asked whether Altschuler examined patients after chemotherapy or if the examination was "done offsite where they actually receive the chemotherapy treatment." Lynch objected on relevance grounds, and the State responded that it was attempting to show

---

[1]          Lynch offered into evidence an article about the Child–Pugh standard that had "Wikipedia" printed at the bottom of the page.

Altschuler's lack of specific expertise—that he "is a jack of all trades and not a master of this." The court overruled the objection.

**¶19**     As noted above, during the cross-examination of Brams, the prosecutor, referring to Brams's interview of Lynch's uncle, asked Brams whether a witness was not credible if he said he remembered something that happened forty-nine years earlier even though it did not stand out in his mind, "because you can vouch for people[.]" The trial court sustained Lynch's objection. After asking whether Brams had testified in a prior case that a witness was mistaken in his memory of long-past events, the prosecutor then inquired, "Well, this is the same sort of thing here, isn't it? On this particular case you took a look at what somebody said and you reached a conclusion that perhaps they were mistaken or whatever term you want to use, right?" Brams explained that her testimony in the prior case was that a suggestive police interview might have influenced the interviewee's statements. Finally, the prosecutor asked Brams about her refusal to produce two documents he requested. Brams explained that she did not realize she had the documents. The prosecutor replied, "And so what you're saying is had you known that those two pages were in your binder, you would have removed them before the interview?" Brams began to deny the accusation, but the prosecutor interrupted. The judge sustained Lynch's objection to the interruption, and Brams explained that she would have disclosed the pages had she known she had them.

**¶20**     The prosecutor also asked Brams whether being an expert on recollected memories is "really just vouching for what somebody is saying," but Lynch did not object. Lynch also failed to object to the prosecutor's remark during closing argument that Brams "was able to tell the Court under oath that [a] witness was wrong, without ever speaking to that witness" and that she followed improper procedures such as taking written notes that "no one can interpret." The prosecutor also accused Brams of refusing to disclose her notes and slanting the truth. Again, Lynch did not object. Lynch also takes issue with the State's comments during closing argument such as, "That's the person they chose," because, in Lynch's view, the comments were calculated to tie Brams's supposed disclosure violations and improper practices to defense counsel. Lynch failed to object at trial.

**¶21**     A prosecutor may "inquire into the credentials and employment of an expert witness to show bias or motive," but cannot

8

"insinuate that an expert is unethical or incompetent without properly admitted evidence to support it." *State v. Bailey*, 132 Ariz. 472, 478–79, 647 P.2d 170, 176–77 (1982).

¶22 Here, although the prosecutor was aggressive, there was no reversible error. *See id.* The trial court sustained Lynch's objections to many of the questions, and the court's instructions to disregard the statements cured any possible prejudice. *See Manuel*, 229 Ariz. at 6 ¶ 24, 270 P.3d at 833. The court did not abuse its discretion in overruling any of the objections. As to the remarks to which Lynch did not object, he fails to show prejudice. Accordingly, the State's remarks during closing argument did not amount to fundamental error. *State v. Morris*, 215 Ariz. 324, 337 ¶ 59, 160 P.3d 203, 216 (2007).

### 6. Appeal to the fears of the jury

¶23 Lynch next contends that the prosecutor improperly appealed to the jurors' fears during his cross-examination of defense expert James Aiken. While inquiring about the security designation that Lynch would receive in prison, the prosecutor asked about an unrelated incident in Arizona where convicted murderers escaped from prison. Lynch did not object to this question. The prosecutor also asked Aiken whether it was possible that Lynch "could stick or prick, with a sharp object, one of the corrections officers." When Aiken answered that the probability was miniscule, the prosecutor asked whether "that would be comfort to the person who got stuck by a needle that Shawn Lynch had used." The trial judge overruled Lynch's relevance objection. Lynch argues on appeal that the State did not offer any reason to believe that the escaped prisoners were in a similar position as him and that there was no evidence to support the State's assertion that he would attack an officer.

¶24 Although the cross-examination was argumentative, and the trial judge could have sustained an objection on that basis, it was relevant. The defense elicited from Aiken testimony that Lynch could be safely housed in prison. The cross-examination was relevant rebuttal to that testimony. *See* Ariz. R. Evid. 401(a) ("Evidence is relevant if [] it has any tendency to make a fact more or less probable than it would be without the evidence . . . ."); Ariz. R. Evid. 611(b) ("A witness may be cross-examined on any relevant matter."). That other offenders escaped from prison makes it less likely that Lynch could be housed safely. Additionally, that Lynch's

hepatitis C could be transmitted through needles makes him more of a threat in prison than one without such a disease.

### 7. Misstating the evidence

¶25 During the cross-examination of Brams, the State asked whether she had previously said it was a waste of time to go over her notes and, after Brams said she did not recall, played a recording in which she said it would be a waste of time to go through every word of her notes. The trial court sustained Lynch's objection to the admission of the recording on the ground that Brams's statement was taken out of context. The prosecutor also asked Brams, "[D]idn't you tell us about a case involving a guy named Braulio Martinez yesterday where you said that he was mistaken because you can read minds?" The trial judge sustained Lynch's objection. Finally, the court sustained Lynch's objection to a statement in the State's closing argument that renting pornographic movies demonstrated Lynch's poor character.

¶26 Intentionally misstating evidence constitutes misconduct. *See State v. Cannon*, 148 Ariz. 72, 77, 713 P.2d 273, 278 (1985). When defense counsel can correct the misstatement at trial, however, we are hesitant to find reversible error. *Id.* Although the prosecutor made inappropriate remarks, defense counsel's objections were sustained and the prosecutor did not argue those points further. The trial judge instructed the jury at the beginning and end of the proceedings not to consider matters to which the court sustained objections. We presume juries follow instructions, *Manuel*, 229 Ariz. at 6 ¶ 25, 270 P.3d at 833, and there is no evidence that the jury failed to heed this instruction. Lynch has not shown that the prosecutor's remarks could have affected the jury's verdict. *See Martinez*, 218 Ariz. at 426 ¶ 15, 189 P.3d at 353.

### 8. Ad hominem attacks on defense counsel

¶27 Lynch argues that the prosecutor committed misconduct by repeatedly resorting to ad hominem attacks against defense counsel. During opening statement and closing arguments, the prosecutor repeatedly characterized Lynch's mitigation evidence as "a myth" and "fanciful" and made other similar comments. The prosecutor also attacked the defense theory that Lynch was not the killer by stating that the DNA evidence "is something that you perhaps will not consider when you are

asked to speculate, as they put it[,] or try to determine who was the person who did the cutting." Lynch did not object to any of these statements.

**¶28** We have consistently held that prosecutors have wide latitude in closing arguments and may argue all reasonable inferences from the evidence. *State v. Hill*, 174 Ariz. 313, 322, 848 P.2d 1375, 1384 (1993). But it is always improper for the prosecutor to "impugn the integrity or honesty of opposing counsel." *State v. Newell*, 212 Ariz. 389, 403 ¶ 66, 132 P.3d 833, 847 (2006) (holding it was improper to imply that defense counsel was arguing for a position he knew to be false). Nonetheless, such comments warrant reversal only if a defendant can show a reasonable likelihood that the misconduct could have tainted the jury's verdict. *Id.* Moreover, "[c]riticism of defense theories and tactics is a proper subject of closing argument." *State v. Ramos*, 235 Ariz. 230, 238 ¶ 25, 330 P.3d 987, 995 (App. 2014) (quoting *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997)). In *Ramos*, the court ruled that the prosecutor's accusation that the defense raised "red herrings" and asked the jury to "check [their] common sense at the door" was proper criticism of defense tactics even though it suggested that defense counsel attempted to mislead the jury. *Id.* at 237–38 ¶¶ 24–25, 330 P.3d at 994–95.

**¶29** Here, although the prosecutor repeatedly suggested that Lynch's defense was not credible, his criticism was directed at defense *theories* rather than defense *counsel*. *Compare State v. Amaya-Ruiz*, 166 Ariz. 152, 171, 800 P.2d 1260, 1279 (1990) (no misconduct where prosecutor called defense theories "outrageous," a "smoke screen," and supported only by "innuendo and inference"), *with State v. Hughes*, 193 Ariz. 72, 86 ¶ 61, 969 P.2d 1184, 1198 (1998) (misconduct to argue that defense counsel and experts "fabricated" insanity defense without evidentiary support). The prosecutor's remarks were not improper. Moreover, the trial judge instructed the jury that the lawyers' arguments are not evidence. The prosecutor's comments did not deprive Lynch of a fair trial. *See Newell*, 212 Ariz. at 403 ¶ 67, 132 P.3d at 847.

### 9. Vouching and relying on evidence outside of the record

**¶30** During closing argument, the prosecutor commented that "this defendant—and he did—slash [Panzarella's] throat." Lynch contends this was improper because the prosecutor had previously objected to the introduction of the guilty verdict, which indicated that only eight of the

guilt-phase jurors found that Lynch had killed a person,[2] and the trial court precluded it. Lynch argues the State improperly argued that Lynch was the actual killer and interfered with his ability to dispute this point by objecting to the introduction of the guilty verdict. Lynch also contends that the prosecutor vouched for the police officers involved by saying, "the Scottsdale Police Department did its darndest" and "[t]hey tried," referring to the department's attempt to find Panzarella's DNA on Sehwani's shirt. The prosecutor also referred to blood-spatter evidence as "the law" and said "the State does not agree that [Lynch's mitigating circumstances] are mitigating circumstances." Lynch did not object to any of these comments at trial.

¶31 A prosecutor improperly vouches by either placing the prestige of the government behind its evidence or suggesting that facts not before the jury support the state's evidence. *Newell*, 212 Ariz. at 402 ¶ 62, 132 P.3d at 846; *State v. Vincent*, 159 Ariz. 418, 423, 768 P.2d 150, 155 (1989). Even if vouching occurs, the trial court may "cure the error by instructing the jury not to consider the attorneys' arguments as evidence." *State v. Payne*, 233 Ariz. 484, 512 ¶ 109, 314 P.3d 1239, 1267 (2013).

¶32 Although the prosecutor said the crime lab tried its "darndest" and referred to blood-spatter analysis as "the law," it was proper for the State to suggest that, because police did not find Panzarella's blood on Sehwani, the jury should infer that Lynch actually committed the murder. Contrary to Lynch's assertion, the fact that four jurors on the guilt-phase jury were not convinced that Lynch was the killer does not make the prosecutor's comments misconduct. *See Bible*, 175 Ariz. at 602, 858 P.2d at 1205 ("[D]uring closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions."). Finally, Lynch did not object to the prosecutor's reference to blood-spatter evidence as the law or the prosecutor's comment that "the State does not agree," and he fails to show that these remarks denied him a fair trial. Although the prosecutor put the prestige of the government behind his evidence by saying that "the State does not agree," the trial court cured the error by instructing the jury

---

[2] The jury was unanimous only in finding that Lynch was a major participant in the felony and had acted with reckless indifference for human life.

not to consider the attorneys' arguments as evidence. The prosecutor's comments did not constitute sufficient misconduct to warrant reversal.

### 10. Misstatement of the law

**¶33**      Lynch contends the prosecutor committed misconduct by misstating the law. A prosecutor should not misstate the law during closing argument. *State v. Serna*, 163 Ariz. 260, 266, 787 P.2d 1056, 1062 (1990). Trial courts are given broad discretion in controlling closing argument, and their rulings will only be overturned for an abuse of discretion. *State v. Tims*, 143 Ariz. 196, 199, 693 P.3d 333, 336 (1985).

a.   A.R.S. § 13-751(G)(1)

**¶34**      Substantial impairment of a person's capacity to appreciate the wrongfulness of his conduct is a statutorily identified mitigating circumstance. A.R.S. § 13-751(G). The prosecutor argued that a person can only fail to appreciate the wrongfulness of conduct if the person admits the conduct. The trial court overruled Lynch's objection. The prosecutor also questioned why Lynch would leave the crime scene and take the knife if he did not think his conduct was wrong. Lynch argues that this was a misstatement of the law because the mental impairment mitigating factor "is a sliding consideration," and the prosecutor argued that it "was a yes or no proposition."

**¶35**      Under § 13-751(G)(1), jurors must consider a "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." The State's remark was not a misstatement of law, but rather an attempt to point out an inconsistency in Lynch's story. The prosecutor was entitled to argue that Lynch committed the murder and appreciated the wrongfulness of his conduct.

b.   History of substance abuse

**¶36**      Lynch contends that the prosecutor misstated the law by arguing that Lynch's substance abuse was not a mitigating factor, but rather something that made the crime worse. Lynch did not object at trial. Substance abuse can be a mitigating factor in capital cases. *State v. Kayer*, 194 Ariz. 423, 438 ¶ 52, 984 P.2d 31, 46 (1999). But a prosecutor does not commit misconduct by arguing that a mitigating factor does not warrant

leniency or that jurors should give it little consideration. *State v. Anderson*, 210 Ariz. 327, 350 ¶ 97, 111 P.3d 369, 392 (2005), *supplemented* 211 Ariz. 59, 116 P.3d 1219 (2005); *see also State v. Prince*, 226 Ariz. 516, 538 ¶ 90, 250 P.3d 1145, 1167 (2011) (no fundamental error where prosecutor argued that defendant's bad temper was not sufficiently substantial to warrant leniency but rather "should be aggravation" where State was precluded from retrying aggravators). The prosecutor did not commit misconduct by suggesting that Lynch's drug use did not warrant leniency.

### c. Pornographic videos

¶37 Lynch claims the prosecutor misstated the law by arguing that Lynch's renting pornographic videos "shows a debasement in the part of [Lynch's] character. And that has already been found, because this murder has been found . . . to be especially heinous and depraved." The trial court correctly sustained Lynch's objection to this argument, properly instructed the jury on the issue, and instructed the jury to disregard remarks to which the court sustained objections. Lynch has not overcome the presumption that the jury followed these instructions. *See Manuel*, 229 Ariz. at 6 ¶ 25, 270 P.3d at 833.

### d. Dysfunctional childhood

¶38 Lynch contends that the prosecutor misstated the law by arguing that Lynch's difficult childhood was "so remote" that it was "an excuse, not a mitigating factor." Lynch was thirty-nine years old at the time of the murder. We have held that "[a] difficult or traumatic childhood is a mitigating circumstance." *Prince*, 226 Ariz. at 541 ¶ 109, 250 P.3d at 1170. Although a defendant does not have to demonstrate a connection between the mitigating circumstances and the crime, the remoteness or lack of a connection between the mitigating factor and the crime may make the mitigating factor less persuasive. *Id.* Thus, a jury may give less consideration to a difficult childhood when a defendant is older. *See id.* (noting on independent review that "[d]ifficult childhood circumstances also receive less weight as more time passes between the defendant's childhood and the offense").

¶39 These remarks were not improper. *See State v. Villalobos*, 225 Ariz. 74, 83 ¶¶ 37–39, 235 P.3d 227, 236 (2010) (reasoning that prosecutor's remark that "there is absolutely nothing mitigating about who he is in light

of what you've seen him do" was not improper); *Anderson*, 210 Ariz. at 350 ¶ 97, 111 P.3d at 392 ("Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight."). Additionally, the court properly instructed the jury on this mitigating factor, and Lynch has not shown that the jury disregarded the instruction.

### e. Life as a "free bite of the apple"

¶40        Lynch argues that the prosecutor misstated the law by arguing that the jury should disregard Lynch's prison sentences. As mitigation, Lynch pointed out that he would never leave prison alive because of his consecutive prison terms. The prosecutor contended that this argument gave Lynch a "free bite of the apple." The prosecutor was not stating the law; rather, he was arguing that the jury should not spare Lynch's life merely because he committed other crimes for which he would have to serve considerable prison time. Moreover, the court properly instructed the jury on this issue.

### f. (F)(6) aggravator

¶41        Lynch contends that the prosecutor misstated the law by characterizing the (F)(6) aggravator as involving separate aggravating factors. During voir dire, the prosecutor told prospective jurors:

> [T]his crime and this is one aggravating factor, was committed in an especially cruel, especially heinous or especially depraved fashion but the prior jury has already found that he was guilty not only of it — even though it's one factor, especially depraved, that's what they found, it was especially heinous.

Lynch objected that the prosecutor was addressing single prongs of the aggravator. The trial court denied Lynch's motion to strike the statement, but told the prosecutor to be clear that it was only one aggravator. The prosecutor then told prospective jurors that the murder "was found to be especially heinous, especially cruel and especially depraved." The trial judge sustained Lynch's objection to the use of the word "and."

**¶42**      In his closing argument, the prosecutor described both especial cruelty and especial heinousness and indicated that each had already been established in this case. He then told the jury, "[C]ompare those three aspects, the murder and the aggravating circumstances, but there is also this indication that [it] was for pecuniary gain." Lynch did not object in the trial court, but now asserts that the prosecutor sought to indicate three aggravators existed when there were only two. Lynch argues this was not accidental, citing the prosecutor's comment that he wished to call witnesses "to show the four factors [he] proved previously," his request to include the definitions of especially cruel, especially heinous, and especially depraved in the preliminary jury instructions, and his proposed jury instruction indicating that "Lynch committed the murder in an especially heinous, cruel *and* depraved manner."

**¶43**      The (F)(6) aggravator is "a single aggravating circumstance that can be established in alternative ways." *Lynch I*, 225 Ariz. at 42 ¶ 84, 234 P.3d at 610. The prosecutor struggled at times during voir dire and closing argument with the disjunctive "or" and conjunctive "and" in explaining the (F)(6) aggravator, but Lynch objected to the misstatements and the trial court had the prosecutor clarify that the (F)(6) aggravator is only one aggravator. The trial court also properly instructed the jury on the (F)(6) aggravator. Lynch has not identified any reversible error.

### 11. Comment on Lynch not testifying

**¶44**      The prosecutor, referring to the encounter between Lynch and Panzarella immediately before the murder, asked the jury in closing argument, "What's going on?" and then asked, "Were words exchanged? Who knows." Lynch did not object, but now asserts that these comments were improper because the only people who could have answered those questions were the victim and Lynch.

**¶45**      A prosecutor may not comment on a defendant's decision not to testify, either directly or indirectly. *State v. Rutledge*, 205 Ariz. 7, 12 ¶ 26, 66 P.3d 50, 55 (2003). A prosecutor's statement is a comment on a defendant's "protected silence" if a jury would "naturally and necessarily" perceive it as a comment on a defendant's failure to testify. *Payne*, 233 Ariz. at 514 ¶ 126, 314 P.3d at 1269 (internal quotation marks omitted).

**¶46**        Here, the prosecutor's statements were proper.  They did not call attention to the fact that Lynch did not testify, but rather pointed out that the events leading up to the murder were unclear.  The jury would not have "naturally and necessarily" perceived the remarks as a comment on Lynch's failure to testify.

### 12. Personalization

**¶47**        Lynch asserts that the prosecutor improperly encouraged the jurors to put themselves in the victim's position.  During his opening statement, the prosecutor said:

> So what happens is the defendant then, as Mr. Panzarella sits there, goes behind him and begins and cuts his throat from ear to ear.  The problem of the unfortunate aspect of that, because in and of itself, cutting somebody's throat is a horrific, ghastly thing, you can only imagine.  I don't think you can even imagine what it's like for somebody to approach you with a knife.  You cannot move and you know they're manhandling you and they are going to cut your throat.

The trial court sustained Lynch's objection and granted his motion to strike. The prosecutor also quoted a line from a poem indicating that every person's death diminishes society as a whole, "so therefore send no one to find for whom the bell tolls, it tolls for thee."  The prosecutor concluded his argument by stating that "[the bell] tolls for each and every one of you, in light of the evidence in this case, to return a verdict of death on Shawn Patrick Lynch."

**¶48**        A prosecutor has wide latitude in closing argument, but may not make arguments that appeal to the jury's fear or passion.  *Morris*, 215 Ariz. at 337 ¶ 58, 160 P.3d at 216.  This includes inviting jurors to place themselves in the victim's position because doing so plays on the jurors' fear of the defendant or sympathy for the victim.  *See id.*  The proper response to an improper prosecutorial comment is an objection, motion to strike, and a jury instruction to disregard the stricken comment.  *See Newell*, 212 Ariz. at 403 ¶ 69, 132 P.3d at 847.

**¶49**　　　The prosecutor's first comment was improper. By telling the jurors that they could not know what it was like to be "manhandled" by the knife-wielding defendant, the prosecutor invited the jurors to place themselves in the victim's position and appealed to their fears. But the trial court properly sustained Lynch's objection, struck the argument, and told the jury to disregard it. Given the presumption that jurors follow instructions, we conclude that this comment did not affect the jury verdict. *See id.*

**¶50**　　　Because Lynch did not object to the prosecutor's referencing the poem at trial, we review for fundamental error. *See Morris*, 215 Ariz. at 337 ¶ 59, 160 P.3d at 216. Lynch cannot show that the references deprived him of a fair trial. The prosecutor did not appeal to the jury's fear of Lynch or sympathy for the victim or ask the jurors to place themselves in the victim's shoes during the murder. Rather, the prosecutor commented that murder affects society as a whole.

### 13. Cumulative misconduct

**¶51**　　　Lynch argues that even if none of the individual instances of prosecutorial misconduct warrants reversal, the cumulative effect requires reversal, particularly given the prosecutor's experience and track record of misconduct. "We consider whether persistent and pervasive misconduct occurred and whether the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *State v. Gallardo*, 225 Ariz. 560, 570, 242 P.3d 159, 169 (2010) (quoting *Morris*, 215 Ariz. at 339 ¶ 67, 160 P.3d at 218) (internal quotation marks omitted).

**¶52**　　　During this retrial of the penalty phase, the prosecutor disturbingly made a number of inappropriate comments, prompting valid objections by Lynch that the trial court sustained. Although the prosecutor made some improper remarks, they did not amount to persistent and pervasive misconduct that deprived Lynch of a fair trial. The trial judge sustained objections to all of the improper comments except, "No, let me ask you the question." The court instructed the jury to disregard questions to which objections were sustained, to only consider testimony, exhibits, and stipulations as evidence, and that attorneys' remarks are not evidence. We presume that jurors follow instructions, *Manuel*, 229 Ariz. at 6 ¶ 25, 270 P.3d at 833, and any cumulative prejudice resulting from the prosecutor's

remarks is insufficient to overcome this presumption. *See Gallardo*, 225 Ariz. at 569 ¶ 40, 242 P.3d at 168 (reasoning that similar instructions cured any prejudice). Given these instructions, and that the "let me ask you the question" remark was the only improper comment to which the court overruled Lynch's objection, the prosecutor's conduct did not deny Lynch a fair trial. As to the statements to which Lynch did not object, we have concluded that Lynch failed to prove fundamental error. We consider these statements as well in our conclusion that prosecutorial misconduct, while present in some instances, was not so pronounced or sustained as to require a new sentencing trial.

## B. Limiting Retrial to Penalty Phase and Preclusion of Guilty Verdict

**¶53**        Lynch claims that the trial court erred when it denied his motion to retry the aggravation phase and prohibited him from offering the guilty verdict as an exhibit during the penalty-phase retrial. He contends that these errors deprived him of an individualized sentencing because they denied the jury an adequate opportunity to evaluate the evidence supporting the aggravating circumstances and established a presumption of death. We review the interpretation of statutes and constitutional provisions de novo, *State v. Hansen*, 215 Ariz. 287, 289 ¶ 6, 160 P.3d 166, 168 (2007), and evidentiary rulings for an abuse of discretion. *State v. Benson*, 232 Ariz. 452, 466 ¶ 58, 307 P.3d 19, 33 (2013).

**¶54**        Following Lynch's second penalty-phase trial, we reversed Lynch's death sentence and remanded for a new penalty-phase proceeding. *Lynch I*, 225 Ariz. at 43 ¶ 89, 234 P.3d at 611. We ordered the trial court to instruct the jury "that the (F)(5) and (F)(6) aggravators have been previously found and that it is not to retry those issues." *Id.* (citing A.R.S. § 13-752(K)). Relying on this language, the trial court on remand denied Lynch's request for an aggravation-phase retrial.

¶55        Section 13-752(K) provides:

> At the penalty phase, if the trier of fact is a jury and the jury
> is unable to reach a verdict, the court shall dismiss the jury
> and shall impanel a new jury. The new jury shall not retry the
> issue of the defendant's guilt or the issue regarding any of the
> aggravating circumstances that the first jury found by
> unanimous verdict to be proved or not proved. If the new
> jury is unable to reach a unanimous verdict, the court shall
> impose a sentence of life or natural life on the defendant.

A.R.S. § 13-752(K). Lynch contends that § 13-752(K) only applies when a jury is unable to decide upon a penalty, and § 13-752(N) applies when a death sentence has been vacated. Under § 13-752(N), "[i]f the sentence of a person who was sentenced to death is overturned, the person shall be resentenced pursuant to this section by a jury that is specifically impaneled for this purpose as if the original sentencing had not occurred." Lynch argues that because the aggravation phase is part of the sentencing proceeding, A.R.S. § 13-752(C), both the aggravation and penalty phases should have been retried. The State responds that the error this Court previously found in *Lynch I* was only in the penalty phase, not the entire sentencing proceeding, and reading the statute as a whole, this Court properly remanded for a trial of only the penalty phase.

¶56        There are two provisions of § 13-752 that inform our analysis. As noted above, § 13-752(N) provides that, "[i]f the sentence of a person who was sentenced to death is overturned, the person shall be resentenced pursuant to this section . . . as if the original sentencing had not occurred." Based on this language, Lynch argues he was entitled to an entirely new sentencing proceeding. *See* A.R.S. § 13-752(C), (D) (indicating that a "sentencing proceeding" consists of both the aggravation and penalty phases). But under § 13-752(O), a defendant whose sentence is overturned must simply be "resentenced . . . by a jury that is specifically impaneled" for that purpose. *See* A.R.S. § 13-752(D) ("If the trier of fact finds that one or more of the alleged aggravating circumstances have been proven, the trier of fact shall then immediately determine whether the death penalty should be imposed. This proceeding is the penalty phase of the sentencing proceeding."). Thus, the statute's text leaves it unclear when a defendant is entitled to an entirely new sentencing proceeding, and when a defendant

is entitled to only a new penalty-phase proceeding. We conclude, as we did in *Lynch I*, that Lynch was entitled only to a new penalty-phase proceeding.

¶57 The history of § 13-752 suggests that subsection (N) applies only to a particular subset of sentences overturned on appeal. The United States Supreme Court decided in *Ring v. Arizona* (*Ring II*), 536 U.S. 584 (2002), that Arizona's capital-sentencing scheme violated the Sixth Amendment because judges, rather than juries, found aggravating factors that made defendants death eligible. *Id.* at 609. This opinion left a large number of capital cases in flux, particularly those cases where defendants had not exhausted their appeals. *See State v. Ring* (*Ring III*), 204 Ariz. 534, 544 ¶ 5, 65 P.3d 915, 925 (2003) ("At the time of the *Ring II* decision, thirty-one defendants sentenced to death had matters pending on direct appeal before this court."). In response, the legislature passed an emergency measure, S.B. 1001, to bring Arizona's death penalty statutes into compliance with *Ring II*. *Id.* at 545 ¶ 13, 65 P.3d at 926. By using the language "a person who *was* sentenced to death," the legislature intended for subsection (N) to be a limited solution for *Ring II*-defective sentences. A defendant who "was sentenced" to death after a judge found aggravating circumstances was entitled to an entirely new sentencing proceeding, unless this Court found the *Ring* error to be harmless beyond a reasonable doubt, because an error of constitutional significance tainted the *aggravation* phase of every such case. Thus, the legislature instructed the courts to act as if the original sentencing simply "had not occurred" and to start the sentencing process over again. A.R.S. § 13-752(N).

¶58 Subsection (O), on the other hand, is more general and pertains to sentences overturned for any reason. This subsection does not instruct the courts that they must act as if the original sentencing had not occurred, but rather directs them to simply sentence or resentence a defendant as appropriate to remedy a sentencing error. A.R.S. § 13-752(O). This Court "may reverse, affirm or modify the judgment appealed from, and may grant a new trial or render any judgment or make any order which is consistent with the justice and the rights of the state and the defendant." A.R.S. § 13-4036. Arizona's sentencing statute seeks to avoid retrials of proceedings untainted by error. A.R.S. § 13-752(J) (providing that, where a jury cannot reach a verdict on aggravating circumstances, "[t]he new jury shall not retry the issue of the defendant's guilt"); A.R.S. § 13-752(K) (providing that, where a jury cannot reach a verdict in the penalty phase, "[t]he new jury shall not retry the issue of the defendant's guilt or the issue

regarding any of the aggravating circumstances that the first jury found by unanimous verdict to be proved or not proved"). Requiring a retrial of the entire sentencing proceeding when the error occurred only during the penalty phase would undermine the statute's purpose.

¶59 We limited the retrial to the penalty phase because Lynch's original sentence was not reversed for a *Ring II*-defective sentence or any other error in the aggravation phase. Rather, the error arose from an improper penalty-phase instruction. *Lynch I*, 225 Ariz. at 42–43 ¶ 88, 234 P.3d at 610–11. Limiting the retrial to the penalty phase was consistent with justice and the rights of the parties.

¶60 Likewise, limiting the retrial to the penalty phase did not deprive Lynch of an individualized sentencing. "[D]uring a second penalty phase, the state and the defendant may introduce evidence pertaining to the aggravating circumstances previously found" because aggravation-phase evidence is "directly relevant to whether the mitigation is 'sufficiently substantial to call for leniency.'" *Prince*, 226 Ariz. at 526 ¶¶ 16, 18, 250 P.3d at 1155 (quoting A.R.S. § 13-752(G)). This affords jurors sufficient opportunity to evaluate the aggravating circumstances when determining whether death is the appropriate penalty. During Lynch's penalty-phase retrial, the jury heard abundant testimony concerning the circumstances of the offense and the aggravating factors, and Lynch was free to offer additional evidence from the guilt and aggravation phases. He was not entitled, however, to retry the aggravation phase when no error occurred in that proceeding.

¶61 Precluding the guilty verdict from evidence likewise did not deprive Lynch of an individualized sentencing. Lynch contends the fact that most of the jurors found him guilty only of felony murder, not premeditated murder, was relevant as a mitigating circumstance. The trial court did not abuse its discretion in ruling that the verdict form was "not related to any aspect of the defendant's character, propensities or record, or circumstances of the offense." Neither the guilty-verdict form nor the jurors' votes provided evidence of the circumstances of the murder.

## C. Refusal to Give *Simmons* Instruction

¶62 Lynch next contends the trial court erred in refusing to instruct the jury that he would never be released if sentenced to prison. He

attempted to waive his right to be considered for a release-eligible sentence and requested that the jury be instructed regarding his ineligibility for release. The trial court ruled that Lynch could not "unilaterally choose which sentence should be imposed" and denied his motion.

¶63 We review jury instructions and alleged constitutional violations de novo. *State v. Nelson*, 229 Ariz. 180, 185 ¶ 21, 273 P.3d 632, 637 (2012); *State v. McGill*, 213 Ariz. 147, 157–58 ¶ 45, 140 P.3d 930, 940–41 (2006). But we review a court's refusal to inform the jury of the defendant's willingness to waive parole eligibility for an abuse of discretion. *Benson*, 232 Ariz. at 465 ¶ 52, 307 P.3d at 32.

¶64 The United States Supreme Court has held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994) (plurality opinion). The State suggested at trial that Lynch could be dangerous. Further, parole is available only to individuals who committed a felony before January 1, 1994, and juveniles. A.R.S. § 41-1604.09(I).

¶65 Parole eligibility is not a right that can be waived. *Benson*, 232 Ariz. at 465 ¶ 54, 307 P.3d at 32. To the contrary, the eligibility decision is within the trial court's discretion. *Id.*; *see also State v. Dann*, 220 Ariz. 351, 373 ¶ 124, 207 P.3d 604, 626 (2009) (holding that defendants may not "presentence" themselves). The sentencing statute in effect at the time of the murder authorized the imposition of release-eligible sentences. A.R.S. § 13-703(A) (renumbered as A.R.S. § 13-751(A)). The trial judge thus properly instructed the jury that she could impose a release-eligible sentence if the jury did not return a death verdict. "*Simmons* applies only to instances where, as a legal matter, there is *no possibility* of parole if the jury decides the appropriate sentence is life in prison." *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000) (emphasis added). Because § 13-703(A) permitted the possibility of Lynch obtaining release, refusing a *Simmons* instruction was not error. *See Benson*, 232 Ariz. at 465 ¶ 56, 307 P.3d at 32. An instruction that parole is not currently available would be correct, but the failure to give the *Simmons* instruction was not error.

¶66 Further, the alternative instruction Lynch offered was inaccurate. Instead of merely instructing on the unavailability of parole, it

would have informed the jury, "If your verdict is that Mr. Lynch should be sentenced to life . . . the court will sentence him to natural life which means Mr. Lynch would never be released from prison for his entire life." As discussed, the court could have imposed a release-eligible sentence. Even if parole remained unavailable, Lynch could have received another form of release, such as executive clemency. We have previously rejected a similarly overbroad instruction. *State v. Boyston*, 231 Ariz. 539, 552–53 ¶ 67–68, 298 P.3d 887, 900–01 (2013) (rejecting instruction that defendant would "never be eligible to be released from prison for any reason for the rest of his life" because it "referred more broadly to any form of release or commutation of sentence").

### D. *Batson* Challenge

**¶67** Lynch next argues the trial court violated *Batson v. Kentucky*, 476 U.S. 79 (1986), when it permitted the State to strike five Hispanic jurors over his objection. "A denial of a *Batson* challenge will not be reversed unless clearly erroneous." *Newell*, 212 Ariz. at 400 ¶ 52, 132 P.3d at 844. We defer to the trial court's ruling regarding the State's motives for a peremptory strike, *State v. Garcia*, 224 Ariz. 1, 10 ¶ 22, 226 P.3d 370, 379 (2010), and review the trial court's application of the law de novo. *Newell*, 212 Ariz. at 401 ¶ 52, 132 P.3d at 845.

**¶68** The State used five of its ten peremptory strikes on prospective jurors 8, 32, 34, 49, and 255, all of whom identified themselves as Hispanic. The prosecutor explained that Number 255 "indicated that she is philosophically opposed to the death penalty" and could not explain "why she believed that life was preferable to death." Number 49 had previously served on two hung juries, and the State argued she would cause the Lynch jury to hang, which would prevent the State from retrying the case. Number 34 had tattoos on his legs and arm, and one of Lynch's mitigating circumstances was that he had hepatitis C—which he contracted when he received a tattoo—and the State did not want a juror on the panel who could identify with Lynch. The prosecutor claimed that Number 32 had "facial hair resembl[ing] ZZ Top" and a long ponytail "like Jerry Garcia," which motivated striking that juror. The State noted that it also struck a white juror with long hair and facial hair. Number 8 "had a brother who was convicted of child abuse, and she was pretty unhappy." The State referred to Lynch's allegation that he had been abused. The trial court found that the State's reasons for striking the prospective jurors were race

neutral. Lynch responded that the State's reasons for striking Numbers 32 (long hair and facial hair) and 34 (tattoos) did not justify the strikes.

**¶69** "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." *Batson*, 476 U.S. at 89. *Batson* challenges are subject to the following three-step analysis:

> (1) the party challenging the strike must make a prima facie showing of discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination.

*Garcia*, 224 Ariz. at 10, 226 P.3d at 379 (quoting *State v. Canez*, 202 Ariz. 133, 146 ¶ 22, 42 P.3d 564, 577 (2002)). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* (quoting *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (per curiam)). A peremptory strike does not violate *Batson* where the prosecutor's explanation is facially race neutral and the defendant "offer[s] no evidence, other than inference, to show that the peremptory strike was a result of purposeful racial discrimination." *Newell*, 212 Ariz. at 402 ¶ 58, 132 P.3d at 846.

**¶70** The trial court found that the State's proffered reasons for the strikes were race neutral, implicitly ruling that Lynch did not carry his burden of proving purposeful racial discrimination. The fact that the State did not ask voir dire questions related to Juror 32's long hair and facial hair or Juror 34's tattoos does not establish that the strikes were pretextual. *See Canez*, 202 Ariz. at 145 ¶ 18, 42 P.3d at 576 (affirming trial court's denial of *Batson* challenge even though the defendant argued the State's justification was pretextual because it did not ask follow-up questions). The court did not err.

### E. Denial of Motion to Strike Juror 5

**¶71** Lynch contends the trial court erred in refusing to strike Juror 5, who had previously worked at the same hospital as one of the State's witnesses, Dr. Vincent Honan. Lynch bore "the burden of establishing that the juror [wa]s incapable of rendering a fair and impartial verdict." *State v.*

*Lavers*, 168 Ariz. 376, 390, 814 P.2d 333, 347 (1991). This Court does not set aside a trial court's refusal to strike a juror "absent a clear showing that the court abused its discretion." *Id.*

¶72 The State called Honan, a gastroenterologist who worked at Banner Good Samaritan Hospital, to testify about hepatitis C, the liver, and Lynch's life expectancy. Juror 5 sent the trial judge a letter explaining that she previously worked in the medical surgical ICU at Banner Good Samaritan and recognized Honan. Juror 5 "had no direct dealings with Dr. Honan," but thought "the surgeons that work at Good Sam are excellent surgeons." She indicated that she could still be fair in Lynch's case. After reviewing Juror 5's questionnaire and considering her responses in open court, the trial judge denied Lynch's motion to strike Juror 5.

¶73 A court is obligated to excuse a juror who cannot render a fair and impartial verdict. Ariz. R. Crim. P. 18.4(b); *see also* A.R.S. § 21-211. We examine three factors when determining if a juror may continue to serve after that juror's objectivity is challenged: (1) the nature of the relationship between the witness and the juror; (2) whether the juror will properly assess the testimony; and (3) the importance of the testimony and whether the testimony was disputed. *Bible*, 175 Ariz. at 574, 858 P.2d at 1177.

¶74 The relationship between Juror 5 and the witness was not sufficient to warrant dismissal. Although knowledge of or professional acquaintance with a witness calls a juror's objectivity into question, it does not require automatic disqualification. *See Hill*, 174 Ariz. at 319–20, 848 P.2d at 1381–82 (finding no abuse of discretion in not dismissing juror who was professionally acquainted with prosecutor, investigator, and coroner involved in the case). Here, Juror 5 only recognized Honan as someone she had seen at the hospital where she no longer worked. Juror 5 stated that, although she may have worked on some of Honan's patients, her dealings were with his surgical residents and not with him.

¶75 Second, Juror 5 assured the court that her knowledge of Honan would not prevent her from examining the evidence objectively. Although this is not conclusive, it weighs heavily against dismissal absent any indicia that the juror could not objectively analyze the evidence. *See, e.g., id.* at 320–21, 848 P.2d at 1382–83; *Bible*, 175 Ariz. at 574–75, 858 P.2d at 1177–78. Although Juror 5 indicated that she thought all the surgeons at Good Samaritan were "excellent," she repeatedly affirmed that this would

not taint her decision-making. The trial court did not abuse its discretion in refusing to strike Juror 5.

## F. Constitutionality of Arizona's Death Penalty

**¶76** Lynch contends that Arizona's death penalty is unconstitutional because it involves torture and a lingering death. He cites the "botched" lethal injection of Joseph Wood III as support for the contention that Arizona cannot humanely implement the death penalty.

**¶77** The United States and Arizona Constitutions prohibit cruel and unusual punishment. U.S. Const. amend. VIII; Ariz. Const. art. 2, § 15. Punishment involving "torture or a lingering death" is cruel. *In re Kemmler*, 136 U.S. 436, 447 (1890). This Court and the United States Supreme Court have rejected the argument that lethal injection is cruel and unusual punishment. *See, e.g.*, *Glossip v. Gross*, 135 S. Ct. 2726, 2738 (2015); *Baze v. Rees*, 553 U.S. 35, 41 (2008); *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

**¶78** We decline to reverse our prior rulings on this issue. Moreover, Lynch's challenge to the current execution protocol is premature and may instead be raised in Rule 32 proceedings. *State v. Kiles* (*Kiles II*), 222 Ariz. 25, 42 ¶ 92 n.20, 213 P.3d 174, 191 n.20 (2009) (quoting *Andriano*, 215 Ariz. at 510 n.9, 161 P.3d at 553 n.9). Lynch's objections to the current injection procedure—the lack of transparency and the protocol to be used—involve information not contained in the record on appeal and are more properly raised in a Rule 32 petition. *See State v. Walton*, 164 Ariz. 323, 328, 793 P.2d 80, 85 (1990) ("One of the purposes of a Rule 32 proceeding 'is to furnish an evidentiary forum for the establishment of facts underlying a claim for relief, when such facts have not previously been established of record.'" (quoting *State v. Scrivner*, 132 Ariz. 52, 54, 643 P.2d 1022, 1024 (App. 1982))).

## G. Independent Review

**¶79** Lynch next argues the mitigation evidence he presented is sufficiently substantial to call for leniency. Because Lynch's crimes occurred before 2002, we "independently review the trial court's findings of aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13-755(A). In doing so, we review the record de novo, considering

"the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Roseberry*, 210 Ariz. 360, 374 ¶ 77, 111 P.3d 402, 416 (2005) (quoting *State v. Greene*, 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998)). When "there is a doubt whether the death sentence should be imposed, we will resolve that doubt in favor of a life sentence." *State v. Carlson*, 202 Ariz. 570, 588 ¶ 70, 48 P.3d 1180, 1198 (2002).

### 1. Aggravation

#### a. (F)(5)

**¶80** An aggravating circumstance is established when "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13-751(F)(5). A murder must be "prompted by the desire for pecuniary gain" for the (F)(5) aggravator to apply. *Anderson*, 210 Ariz. at 351 ¶ 105, 111 P.3d at 393.

**¶81** After initially leaving Panzarella's residence, Lynch and Sehwani used his American Express card at two stores and attempted to use it at a third. Panzarella reported the card as lost, and Lynch and Sehwani returned to Panzarella's residence, tied him to a chair, and killed him. Panzarella's debit card and credit card were then repeatedly used, including to secure charges at a motel room registered in Lynch's name. Authorities found Panzarella's gun and magazine in Lynch's motel room and Panzarella's car keys in the truck Lynch was entering at the time of his arrest. These facts establish that Lynch and Sehwani returned to Panzarella's residence intending to steal more and to murder Panzarella to avoid detection. The (F)(5) aggravator was established.

#### b. (F)(6)

**¶82** Under A.R.S. § 13-751(F)(6), an aggravating circumstance is established when "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." A murder is especially cruel if "the victim was conscious during the violence and . . . the defendant knew or should have known that the victim would suffer mental anguish or physical pain." *State v. Hargrave*, 225 Ariz. 1, 13 ¶ 43, 234 P.3d 569, 581 (2010). "Mental anguish" includes a victim's uncertainty about his fate. *State v. Kiles* (*Kiles I*), 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993).

¶83        Panzarella's spinal column was not cut, so his nervous system remained intact and he felt pain from the time his throat was cut until he lost consciousness.   Panzarella also experienced mental anguish.   The evidence demonstrated that he was conscious when bound to the chair. The cord used to bind Panzarella was tied in a large number of knots that were "fairly secured," indicating that Panzarella had ample time to contemplate his fate.   Ligatures, abrasions, and bruising on Panzarella's wrists, hands, forearm, shoulder blade, back, and chest indicate that he struggled.   *See State v. Djerf*, 191 Ariz. 583, 596 ¶ 50–51, 959 P.2d 1274, 1287 (1998) (inferring mental anguish from contusions and abrasions on victim's wrists).   The murder was especially cruel, so the (F)(6) aggravator was established.

### 2.  Mitigation

#### a.  Medical condition

¶84        Lynch emphasizes his medical condition as a reason for leniency.  Dr. Altschuler testified at length about Lynch's hepatitis C and complications thereof, including cellulitis in his legs from a bacterial infection, the possibility that he could lose his legs, his several hospitalizations for encephalopathy, and his diminished life expectancy. Defense counsel argued that Lynch would die in prison because of his medical condition and his 21-year sentence for the non-capital offenses. The State's expert, Dr. Honan, agreed that Lynch has "significant chronic liver disease," but did not "see negative prognostic indicators to suggest that he is terminally ill."

¶85        Although there need not be a nexus between mitigation and the crime in order for mitigation to be considered, "failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence."  *Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at 849. We assign minimal mitigating value to a defendant's post-murder physical health because it "does not address his pre-murder character, nor does it address his propensities, his record, or the circumstances of the offense." *Kayer*, 194 Ariz. at 440 ¶ 61, 984 P.2d at 48.

¶86        Here, Lynch's medical condition is a mitigating circumstance of only minimal value.  The defense suggested that he obtained hepatitis C from receiving a tattoo in jail *after* the murder, so his medical condition is not probative of his character, propensities, or record at the time of the

murder or the circumstances of the offense. Further, we afford minimal value to the fact that a defendant will remain imprisoned for the rest of his life. *State v. Lehr*, 227 Ariz. 140, 155 ¶ 78, 254 P.3d 379, 394 (2011) (reasoning that the fact that a defendant "would remain imprisoned for his natural life if he is not sentenced to death" is entitled to little mitigating value).

### b. Killer unknown

**¶87**          "[P]articipation in a crime may be considered as mitigation where a defendant demonstrates that while he was legally accountable for the conduct of another, his participation in the crime was relatively minor." *State v. Hoskins*, 199 Ariz. 127, 150 ¶ 100, 14 P.3d 997, 1020 (2000), *supplemented* 204 Ariz. 572, 65 P.3d 953 (2003). The evidence demonstrated that Lynch was a major participant in the crime. The American Express receipts discovered in Panzarella's residence indicate that Lynch and Sehwani returned after Panzarella reported the card lost. Property belonging to Panzarella was located in Lynch's motel room and in the truck Lynch was entering at the time of his arrest. There was also ample evidence indicating that Lynch was the killer. The evidence showed that the person who cut Panzarella's throat was standing behind Panzarella, the blood on Lynch's shoes was consistent with him standing in that position, and the footwear impressions at the crime scene were consistent with Lynch's shoes. Lynch's alleged minimal participation is not a mitigating circumstance.

### c. Disparity in sentence

**¶88**          "A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance if no reasonable explanation exists for the disparity." *Garcia*, 224 Ariz. at 21 ¶ 98, 226 P.3d at 390 (quoting *Kayer*, 194 Ariz. at 439 ¶ 57, 984 P.2d at 47). Disparity is not mitigating if it results from factors suggesting the appropriateness of the sentences, such as a difference in culpability or "an appropriate plea agreement with one of the defendants." *State v. Detrich*, 188 Ariz. 57, 69, 932 P.2d 1328, 1340 (1997). Here, evidence suggested that Lynch was the killer, and Sehwani received a life sentence as a result of a plea agreement. Sentencing disparity is not a mitigating circumstance here.

d. Drug abuse

¶89 Lynch argues that his drug use is both a statutory and non-statutory mitigating circumstance. A mitigating circumstance is proven if "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13-751(G)(1). Lynch asserts that drug use impaired his ability to appreciate wrongfulness. In such a case, the defendant must show some relationship between drug use and the offense to avail himself of the (G)(1) mitigating circumstance. *State v. Murdaugh*, 209 Ariz. 19, 34 ¶ 74, 97 P.3d 844, 859 (2004); *see also State v. Sansing*, 206 Ariz. 232, 239–40 ¶¶ 28–29, 77 P.3d 30, 37–38 (2003) (finding failure to prove (G)(1) factor where defendant presented "only minimal testimony about his drug use on the day of the murder").

¶90 Lynch presented evidence that he suffered from drug and alcohol abuse and that he used drugs around the time of the offense. He also explained how crack cocaine use affects the brain. Lynch failed to show a relationship between his drug and alcohol use and the offense, however, other than merely suggesting that he used crack cocaine near the time of the murder. Any drug use is therefore entitled to minimal mitigating value.

¶91 As to non-statutory mitigation, Lynch's drug abuse is entitled to minimal value. Even if a defendant establishes his drug addiction, we give minimal value to this evidence if he "'fail[s] to tie his . . . drug abuse to the crime or to his mental functioning' when the murder occurred." *Garcia*, 224 Ariz. at 22 ¶ 104, 226 P.3d at 391 (quoting *State v. Pandeli*, 215 Ariz. 514, 532 ¶ 75, 161 P.3d 557, 575 (2007)). Although Lynch showed that he abused drugs, he did not tie his drug abuse to the crime other than by stating generally that crack cocaine use causes delusional thinking. Lynch's drug abuse deserves little value as a mitigator.

e. Dysfunctional childhood and abuse

¶92 Lynch presented evidence that he was raised in a dysfunctional family where he was physically and emotionally abused, his parents neglected him, and his parents were alcoholics. A difficult childhood may be a mitigating circumstance, but we give it little value

"absent a showing that it affected the defendant's conduct in committing the crime." *Garcia*, 224 Ariz. at 22 ¶ 107, 226 P.3d at 391. The amount of time that has passed since the defendant's childhood is relevant. *Prince*, 226 Ariz. at 541–42 ¶ 111, 250 P.3d at 1170–71 ("Prince was twenty-six years old when he killed Cassandra, attenuating the impact of his dysfunctional childhood on his conduct."); *Garcia*, 224 Ariz. at 22 ¶ 107, 226 P.3d at 391 (affording little value to difficult family background because defendant was thirty-nine at the time of the murder and "no evidence linked his childhood experiences to the murder"); *State v. Ellison*, 213 Ariz. 116, 144 ¶ 136, 140 P.3d 899, 927 (2006) (reasoning that "childhood troubles deserve[d] little value as a mitigator for the murders [defendant] committed at age thirty-three").

¶93        Here, Lynch was thirty-nine years old at the time of the murder. He failed to establish that his childhood affected his conduct. Lynch's dysfunctional family background deserves little value as a mitigator.

   f.   Brother's death

¶94        Lynch also asserts that the drug-overdose death of his brother, Donald, is a mitigating factor. Donald died after the murder, so his death deserves little value as mitigation. *See Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at 849 (reasoning that even though we do not require a nexus between the mitigation and the crime before we consider mitigation evidence, the absence of "such a causal connection may be considered in assessing the quality and strength of the mitigation evidence").

   g.   Lack of future dangerousness and other sentences

¶95        Lynch also presented evidence that he would not be a danger to prison staff, inmates, or the general public if he received a life sentence. He also offered as mitigation his twenty-one-year sentence for the non-capital crimes that would run consecutively to the sentence he received for the first-degree murder. We "accord minimal weight to the prospect that [a defendant] will be a 'model prisoner'" because "[a]ll prisoners are expected to behave in prison." *Lehr*, 227 Ariz. at 155 ¶ 78, 254 P.3d at 394. The fact that a defendant "would remain imprisoned for his natural life if he is not sentenced to death" is also entitled to little value. *Id.*; *see also Garcia*, 224 Ariz. at 22 ¶ 108, 226 P.3d at 391 (affording minimal value to

defendant's argument that he posed no risk of future dangerousness because he would never be released from prison). We give Lynch's low risk of misbehavior in prison and consecutive non-capital sentences little value as mitigation.

### 3. Propriety of death sentence

¶96        In light of the (F)(5) and (F)(6) aggravating circumstances, which reflected an especially cruel murder committed for pecuniary gain, we conclude that Lynch has not identified mitigating circumstances sufficiently substantial to call for leniency.

### III.    CONCLUSION

¶97        For the reasons stated, we affirm Lynch's death sentence.[3]

---

[3]        Lynch raises twenty-six additional constitutional claims that he acknowledges this Court has previously rejected but that he wishes to preserve for federal review. We decline to revisit these claims.